# United States Bankruptcy Court
## Eastern District of Virginia
### at Alexandria Division

In Re:

      M.D.M. Property, LLC    :                       Chapter 11

      Debtor         :                     Case No. 14-13987 RGM

## APPLICATION FOR AUTHORIZATION OF A REAL ESTATE PROFESSIONAL COMPENSATION

Weon G Kim, counsel for M.D.M. Property, LLC, pursuant to 11 U.S.C. §330 and §331, Rule 2016 (a) of the Federal Rules of Bankruptcy Procedure and Local Rule 2016-1, hereby applies for allowance of compensation of $11,084.64 to be paid over 12-month period for professional services rendered in retaining new tenants. In support of this application, the applicant and Counsel Weon G Kim respectfully states as follows:

## CASE HISTORY

1. On October 28, 2014 the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  The Debtor has remained in possession of its assets and is now operating its business as a Debtor in Possession.

## APPLICATION FOR COMPENSATION FOR A REAL ESTATE PROFESSIONAL FEE AND COSTS

2. The Debtor has retained Gunselman Realty and Property Management, LLC and Kim Gunselman as a REAL ESTATE PROFESSIONAL in bringing in tenants.

3. The REAL ESTATE PROFESSIONAL has worked for the Debtor and Estate and retained a new tenant as seen at the attached lease contract and The Debtor is still looking for bringing in additional new tenants.

4. The applicant is now making application of compensation herein for a real estate professional in bringing in new tenants whose lease contract attached hereto together with the fee agreement.

5. The Debtor agrees to compensate the REAL ESTATE PROFESSIONAL for services performed under this contract as follows:

   a.  If the REAL ESTATE PROFESSIONAL is acting as a dual agent the Debtor agrees to pay commission of 3% of the total basic rent payment for the 5-year lease term.

   b. If the REAL ESTATE PROFESSIONAL is the listing agent and there is another leasing agent the Debtor agrees to pay commission of 4% of the total basic rent payment for the 5-year lease term.

   c. The aforesaid fee is to be paid over 12-month period.

6. The REAL ESTATE PROFESSIONAL has never been paid before on this matter

7. Upon information and belief, the REAL ESTATE PROFESSIONAL has been working for Debtor as a listing agent the another agent was working as a leasing agent. Both worked together in bringing in a new tenant.

8. The basic rent payment for the 5-year lease term goes in the sum of $277,116 ($52,200+$53,760+$55,380+$57,036+$58,740)

2

9.  The amount of the commission to be paid to the REAL ESTATE PROFESSIONAL is
    $11,084.64
    which amounts to 4% of the sum of $277,116.

10. The services performed by the REAL ESTATE PROFESSIONAL have benefited the
    Estate and the Debtor and accordingly this counsel asks for compensation for said
    services.

11. The REAL ESTATE PROFESSIONAL has received no promises to have their fees
    paid by third parties. All payments are being applied for through the Court and
    payment is to be made by the Debtor and/or its Estate from funds being held on DIP
    account or income from the Debtor.

12. The counsel respectfully provides this Court with the following pertinent information:
    Lease contract and Listing agreement.

## LEGAL STANDARD

13. This court must review the reasonableness of the fees of the REAL ESTATE
    PROFESSIONAL based on whether (a) the services were reasonable at the time
    provided and (b) the services provided benefited or could have benefited the Debtor
    or the Estate. Based on the proper standard and the record of this proceeding, the fees
    requested in this case are reasonable.

14. All professional services taken by the REAL ESTATE PROFESSIONAL in this case
    were at the direction or on behalf of the Debtor and Estate.

15. Section 11 U.S.C. §330(a) (3) enumerates factors to consider in reviewing the
    propriety of requests for compensation of professionals. The factors are (a) the time
    spent; (b) the rates charged; (c) whether the services were necessary to the
    administration of, or beneficial toward the completion of, the case; (d) whether the

3

services were performed within a reasonable amount of time commensurate with the complexity, importance and nature of the issue or task presented; and (e) whether compensation is reasonable based on customary fees charged by comparably skilled practitioners in case other than bankruptcy cases. The counsel hereby assures that this application satisfies the required guidelines and the requirements on the above code.

16. Counsel's application for compensation is made pursuant to the guidelines originally enumerated in <u>Johnson v. Georgia Highway Express Inc.,</u> 488 F.2d 714 (5th Cir. 1974) and expressly adopted by this Circuit in <u>Barber v. Kimbrells, Inc.</u> 577 F.2d 216,226 (4th Cir. 1978), cert. denied, 439 U.S. 934; <u>Harman v. Levin,</u> 772 F.2d. 1150 (4th Cir. 1985); and <u>Daly v. Hill,</u> 790 F.2d. 1071 (4th Cir. 1986).

WHEREFORE, the undersigned counsel prays that this Court enter an Order authorizing the total payment of $11,084.64 to be paid over 12-month period for professional services rendered by a Real Estate Professional and for such other relief as the Court deems just and proper.

Dated: July 1st, 2015.


LAW OFFICE OF WEON G KIM

<u>/s/ Weon G. Kim</u>
Weon G. Kim (VSB#73104)
8200 Greensboro Dr. Ste. 900
McLean, VA 22102
Jkkchadol99@gmail.com
Tel (571) 278-3728
Fax (703)462-5459

## CERTIFICATE OF SERVICE

I hereby certify that the above fee Application for REAL ESTATE PROFESSIONAL were
served by USPS regular mail upon the creditors below listed and posting at ECF on July 1st 2015:


Respectfully submitted,


By, /s/ Kim Weon Geun
WEON G. KIM VSB #73104
8200 Greensboro Dr. #900
McLean VA 22102
571-278-3728,Fax 703-462-5459
JKKCHADOL99@GMAIL.COM


Annemarie G McGavin
Buchanan Ingersoll and Rooney PC
1700 K Street NW #300
Washington D.C. 20006-3807

Buchanan Ingersoll and Rooeny PC
c/o William Garvin, esq.
1700 K Street N.W. #300
Washington D.C. 20006

Gunselman Realty Property Management LLC
4536 Plank Rd
Fredericksburg VA 22407

Internal Revenue Service
PO Box 7346
Philadelphia PA 19101-7346

Spotsylvania County Commissioner of Revenue
c/o Real Estate Division
PO Box 175
Spotsylvania VA 225553-0175

5

Timothy P Palmer, esq
Buchanan Ingersoll and Rooney PC
One Oxford Center
301 Grant Street 20th Floor
Pittsburgh PA 15219

VA Department of Taxation
PO Box 26685
Richmond VA 23261-6685

Wilshire State Bank
3200 Wilshire Blvd
Los Angeles CA 90010

6



**Virginia Association of Realtors®**
**COMMERCIAL LISTING AGREEMENT**
**(TO SELL OR LEASE)**

Firm Name CHRISTMAN REALTY & PROPERTY MANAGEMENT
Address 4536 PLANK RD.
City/State/Zip FREDERICKSBURG, VA 22407

**1. EXCLUSIVE RIGHT:** The undersigned owner (the "Owner") KEM PROPERTIES
hereby grants unto the above named firm as broker (the "Broker") for and in consideration of the services to be
rendered by Broker, the exclusive and irrevocable right and privilege commencing on December 15, 2014
and terminating on December 14, 2016 (the "Listing Period") to [check all applicable]: ☐ sell
☒ lease the property described herein for the price and upon the terms and conditions as set forth herein.

Property located in City/County SPOTSYLVANIA , Virginia, commonly known as:
(Street Address) 5709 Salem Run Blvd
(Legal Description) 22A1-A-0
together with all improvements thereon and fixtures attached thereto, and all easements, rights, and
appurtenances thereunto belonging, including any right, title and interest of Owner in and to the adjacent
streets, alleys or rights-of-way (the "Property"). Owner shall furnish Broker with all pertinent information
relating to the Property.

**2. LISTING PRICE AND TERMS:**

~~A. Sale. If the Property is listed for sale with Broker, the sales price of the Property shall be
$_____ or such other price, terms or conditions as may be hereafter agreed upon in writing by
Owner. Possession of the Property shall be at settlement unless otherwise agreed by Owner and purchaser.~~

B. **Lease.** If the Property is listed for lease with Broker, the rental price for the Property shall be
[select one]:
$15.00 per square foot or $ N/A per month, plus common area
maintenance ("CAM") charges of $ 3.00/RSF , if applicable. Real property taxes and property
insurance shall be paid by TENANT . Other rental terms: SUITE 5100 -
[GRIBER 3,480 SQ FT] (94350/MO 8670/MO) [SUITE 5102 SALON] - 1500 SQ FT(51,875/MO
8375/MO) , [SUITE 5106 RESTAURANT] - 1800 SQ FT

~~C. Agent for Collection of Rent. [Check if applicable]: ☐ Owner does hereby appoint Broker, its
successors or assigns, as Owner's agent to collect all rent during the term of the lease and/or any renewals or
extensions thereof, upon the terms and conditions set forth in the lease. Broker shall deduct the compensation
due to Broker as set forth in paragraph 4 below and remit the balance to Owner within thirty (30) days. In no
event shall Broker be liable to Owner for any tenant's nonpayment of rent or other breach of lease.~~

**3. EXTENSION:** This Listing Period shall automatically extend and renew from month to month following
the expiration of the Listing Period unless either party shall give the other written notice of termination at least
thirty (30) days prior to the expiration of the Listing Period or any extension period, whichever is applicable.

VAR Form 710 (Rev. 1/13)
Christman Realty and Property Management, LLC, 4536 Plank Road Fredericksburg, VA 22407
Phone: 540-413-2707    Fax: 540-413-2703    Kim Christman
Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026    www.zipLogix.com
Salem Run

Exhibit A-1

4. **COMPENSATION.** *See paragraph 15* (handwritten, circled initials)

~~A.    Commission. If, at any time during the term of this Listing Agreement, Owner sells, transfers or leases the Property or enters into a contract to sell, transfer or lease the Property to a purchaser or tenant, whichever is applicable, who is ready, willing and able to purchase or lease the Property on terms acceptable to Owner, or Owner receives an offer in writing signed by a purchaser or tenant by which such purchaser or tenant offers to purchase or lease the Property, whichever is applicable, on the terms and conditions set forth herein or otherwise acceptable to Owner, then Owner agrees to pay to the Broker a broker's commission of~~

~~_____ percent ( _____ %) of the gross purchase price or gross lease price, whichever is applicable;~~

~~If the Property is sold, transferred or leased solely by Broker or otherwise is sold, transferred or leased by Owner without Broker. If the Property is sold, transferred or leased in conjunction with a co-broker, buyer's agent or tenant's agent, then Owner agrees to pay to the Broker a broker's commission of~~

~~_____ percent ( _____ %) of the gross purchase price or lease price, whichever is applicable.~~

*after motion hearing and approval by Bankruptcy Court with terms* (handwritten)

~~The compensation due to Broker pursuant to this paragraph (referred to herein as the "Fee") shall be payable to Broker in cash at settlement, if the Property is sold or on the first day of each month during the lease term,~~ *12-month project* ~~if the Property is leased. Broker has advised Owner of Broker's general company policy regarding cooperating with and compensating other agents. If Owner withdraws the Property from the market or otherwise prevents Broker from selling or leasing the Property during the Listing Period or any extension thereof without written consent from Broker, Owner agrees to pay Broker the Fee for its services. As used herein, "gross lease price" shall mean: (i) the base rent of any lease plus amortized improvements, real estate taxes, insurance and CAM, if any, paid by the tenant during the entire term of the lease and any renewals or extensions of the lease; (ii) any new or replacement lease for the Property; and (iii) any other new or additional space and improvements later leased by the tenant in the same building, shopping center (including outparcels), warehouse or office complex as the Property.~~ *✓5-year* (handwritten)

B.    ~~**Tenant's Purchase of Property.** If any tenant in the Property, or its principals, directly or indirectly, purchases or otherwise acquires ownership of the Property during the lease term or any renewal or extension thereof, or during any new or replacement lease, or for a period of~~ *LEASE TERM PLUS 90 DAYS* ~~( **3** ) months thereafter, upon any terms, Broker, its successors or assigns, shall be deemed the procuring agent in the transaction and shall be paid a broker's commission of~~ *Five* ~~_____ percent ( **5.000** %) of the gross purchase price at settlement.~~ (circled initials) ~~The foregoing provisions for the payment of the brokerage commission in connection with any lease between Owner, as landlord, and the tenant, and a covenant which shall run with the Property, and shall be binding upon all successors or assigns of Owner and Owner's interest in the Property or any part thereof.~~

5.    **FEE AFTER EXPIRATION.** Owner shall also pay the Fee to Broker if within one hundred eighty (180) days after the expiration of the Listing Period or any extension thereof the Property or any portion thereof is sold, transferred or leased to anyone: (i) with whom Broker or Owner has had contact during the Listing Period or any extension thereof regarding the sale or lease of the Property or any part thereof; or (ii) whose name appears on any list with whom Broker or Owner shall have had contact during the Listing Period or any extension thereof (the "Registration List"), provided Broker shall have provided such written Registration List to Owner within thirty (30) days following expiration of the Listing Period or extension thereof.

6.    **ADVERTISING AND ACCESS.** Broker is authorized to advertise the Property and shall have the exclusive right to place a sign or signs on the Property if, in Broker's opinion, such would facilitate the sale or lease thereof. Owner agrees to make the Property available to Broker and real estate brokers and salespersons employed by or affiliated with Broker at all reasonable hours for showing to prospective purchasers or tenants. Owner also agrees to refer to Broker all inquiries or offers which Owner may receive regarding the Property during the Listing Period or any extension thereof.

VAR Form 710 (Rev. 1/13)

2

**7. OWNER'S REPRESENTATIONS.** Owner hereby warrants and represents unto Broker that: (a) Owner is the owner of the Property or has the legal authority to execute this Listing Agreement on behalf of the Owner; (b) no other person or entity has any right to purchase or lease the Property or any portion thereof by virtue of any agreement, authorization, option or right of first refusal; (c) ~~the Property is not subject to the jurisdiction of any court in any bankruptcy, insolvency, conservatorship, receivership or probate proceeding;~~ (d) Owner will cooperate fully with Broker in reviewing any agreements for the sale or leasing of the Property; (e) there are no other brokerage agreements between Owner and any other person or entity and that no potential purchasers or tenants have been in contact with Owner as the result of any prior brokerage agreement or similar commitment whatsoever; and (f) to the best of Owner's knowledge, no toxic or hazardous materials (as said terms are defined in any applicable federal or state laws) have been used, discharged or stored on or about the Property by the Owner, and to the best of the Owner's knowledge, no such toxic or hazardous materials are now or will be at settlement located on or below the surface of the Property. If any such toxic or hazardous materials are discovered at the Property contrary to the above warranty and representation, all costs of removal of same or expenses of defending any action brought against the Broker by any individual, entity or governmental authority because of same shall be borne by Owner.

**8. INTERNET AND OTHER PUBLICATION:** Owner is aware that Broker, as a member of a Multiple Listing Service ("MLS"), may file the Property and information regarding it with the local MLS and Commercial Information Exchange ("CIE") if applicable, maintained by such MLS and other Internet databases maintained by third-parties. Owner understands that the CIE is a central repository of data regarding commercial properties for sale, lease or development and that the primary objective of the CIE is to distribute information about commercial property listings to all of its members. Broker and/or CIE may distribute or post listing information on websites, magazines and other types of advertising media. By initialing here ____________, Owner desires to opt-out of Internet publication.

**9. RELATED BUSINESS AND SERVICES:** The Listing Broker and Selling Broker may engage in mortgage loan, title insurance, real estate settlement and other real estate related businesses and services from which they receive compensation during the course of this transaction, in addition to the real estate brokerage fees.

**10. BROKER'S LIABILITY:** Broker's duties and activities pursuant to this Listing Agreement will be limited to entry upon the Property to show and exhibit same to prospective purchasers and tenants, and to provide information with respect to the Property and its condition based on Broker's actual knowledge thereof. Owner agrees, at its sole cost and expense, to indemnify, defend and hold harmless Broker and its officers, directors, employees, agents, independent contractors and sales persons, jointly and severally, from and against any and all claims, actions, proceedings, liabilities, injuries, judgments, damages, losses, settlements, costs and expenses, including, without limitation, attorney's fees and costs, relating in any manner to or arising out of any of the following: (i) all actions taken or omitted by Broker under this Agreement, except where Broker has been adjudged to have engaged in willful misconduct or has been grossly negligent with respect to the performance of its duties hereunder; (ii) the physical condition of the Property; (iii) the existence of any environmental contaminants, hazardous or toxic substances or products in, on or in proximity to the Property; and (iv) any failure or omission by Owner to provide Broker with complete or accurate information concerning the Property or its condition.

**11. ENFORCEMENT:** The Owner agrees that the Broker may take action to enforce this Listing Agreement or collect any associated costs, fees or damages. Owner agrees to reimburse, indemnify or pay any Broker costs incurred in the enforcement of this Listing Agreement or collection costs, fees and damages, including incidental expenses and reasonable attorney's fees.

**12. NOTICES:** All written notices of any kind which either party may be required to serve on the other in connection with this Listing Agreement shall be delivered in person, sent via certified mail, return receipt requested, or by FEDEX (or any comparable overnight delivery service with signature required upon delivery) to the following addresses:

If to Broker: At the address set forth on page 1 of this Agreement

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com

Salem Run

Service of any such notice shall be made by mail shall be deemed to be complete on the earlier of the following to occur: (i) on the delivery date; or (ii) on the third day after mailing or deposit with an overnight delivery service. Either party hereby may, from time to time by notice in writing, serve on the other as aforesaid, designate a different mailing address or a different person to which all such notices or demands are intended to be addressed.

If to Owner:

_____

_____

_____

13. SALE OF PROPERTY. Upon the sale of the Property, Owner agrees to convey the Property to any purchaser or purchasers by general warranty deed with the usual English covenants of title and free from all encumbrances (for taxes), and free (for taxes or otherwise), but subject to applicable easements and restrictive covenants, and to the specific terms and conditions contained in the purchase agreement.

14. WAIVER OF CONFLICT. Owner hereby authorizes Broker to represent and serve as exclusive agent for any prospective purchaser of the Property or any part thereof, and Owner hereby waives any conflict of interest claim which might arise as a result thereof.

15. OTHER TERMS: IF THE BROKER IS ACTING AS A DUAL AGENT (REPRESENTING OWNER AND TENANT), THE OTHER AGREES TO PAY BROKER A COMMISSION OF 3% OF THE GROSS LEASE TERM. AND IF THE COMMISSION IS THE LISTING AGENT, THERE IS ANOTHER SELLING AGENT, THE SELLER AGREES TO PAY A COMMISSION OF 4% OF THE GROSS LEASE TERM.

16. MISCELLANEOUS:

A. This Listing Agreement is not intended to be an offer to sell or lease to a third party, nor may any third party rely upon it as such an offer. Further, this Listing Agreement does not confer upon Broker the power or authority to either make or accept an offer or counteroffer to sell or lease the Property. The Property may be sold or leased only by a written agreement executed by Owner, or by an attorney-in-fact for Owner under a written power of attorney.

B. If, after a valid agreement for the purchase or leasing of the Property is executed by Owner and a purchaser or tenant, whichever is applicable, there is a default by such purchaser or tenant which prevents performance of such agreement through no fault of the Owner, Broker agrees that Owner will not be liable for the Fee of Broker and that Broker shall look to such defaulting purchaser or tenant for compensation relating to such contract. Owner agrees that if such a default occurs, this Listing Agreement shall remain in effect between the Owner and that Broker until the expiration and final payment of the Fee of Broker by such defaulting purchaser or tenant shall satisfy an obligation which may arise if, subsequent to such default, another valid agreement for the purchase or leasing of the Property is brought about by Broker.

C. If, (i) after a valid agreement for the purchase or leasing of the Property is executed by Owner and a purchaser or tenant, whichever is applicable, there is a default by Owner which prevents performance of such agreement through no fault of Broker, or (ii) Owner fails to fully perform the obligations of Owner set forth herein, Owner shall be liable to Broker for the Fee, as compensation for the services hereunder, and the reasonable attorneys' fees and expenses incurred by Broker, if any, in enforcing the terms and conditions hereof.

D. Owner understands and agrees that, in consideration of the use of the services of Broker and the MLS identified in paragraph 6, neither Broker, its officers, directors, brokers, real estate agents or employees,

VAR Form 710 (Rev. 1/15)

4

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com

ner the MLS or REALTORS® association, their respective directors, officers and employees, shall be liable for any vandalism, theft or damage of any nature whatsoever to the Property or its contents during the Listing Period and any extension thereof, and Owner waives any and all rights, claims, and causes of action against any of them and holds them harmless for any property damage or personal injury arising from the use of or access to the Property by any person during the Listing Period and any extension thereof, but excluding property damage or personal injury arising out of their own willful negligence.

E.   This Listing Agreement shall be construed and interpreted according to the laws of the Commonwealth of Virginia and may not be modified except by written instrument executed by the parties. This Listing Agreement shall not be assigned, except with the prior written consent of the other party, and shall inure to the benefit of the heirs, personal representatives, successors, and permitted assigns of the parties.

F.   Use of Listing Content; Intellectual Property Assignment. Seller acknowledges and agrees that all photographs, images, graphics, video recordings, virtual tours, drawings, written descriptions, remarks, narratives, pricing information, and other copyrightable elements relating to the Property provided by Seller to Broker or Broker's agent, or otherwise obtained or produced by Broker or Broker's agent in connection with this Agreement, and any changes to such information (the "Listing Content"), may be filed with one or more multiple listing services, included in compilations of listings, and otherwise distributed, publicly displayed and reproduced. Seller hereby irrevocably assigns and transfers to Broker any and all copyright rights and other intellectual property rights, and all actions and causes of action related to the foregoing, and all damages, profits, and other recoveries related thereto, which Seller may have or acquire in and to any and all Listing Content. Seller represents and warrants to Broker that the Listing Content and this assignment of rights to Broker does not violate or infringe upon the rights, including any copyright rights, of any person or entity. Seller shall indemnify Broker against all damages, costs, and liabilities, including twenty-five percent (25%) attorney fees, arising from any claim that the Listing Content or any portion of the Listing Content infringes the rights of any third party.

Owner:

Name: _____

Date: _____

Title: _____

Accepted by:

Firm/Broker: _____   Date _____

G. Copyrighted 2011 by the Central Virginia Regional MLS™, LLC ("CVR MLS"). This form is licensed to the Virginia Association of Realtors® ("VAR") for use by members of VAR and may not be otherwise used or duplicated without the written consent of CVR MLS. Seek legal advice if you do not understand any provision of this form.

Produced with zipForm® by zipLogix  18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com                    Below Row

# AGREEMENT FOR EMPLOYMENT OF A
# REAL ESTATE PROFESSIONAL FOR LEASING

M.D.M. Property, LLC, a Virginia organization (hereinafter, the client), and the Gunselman Realty and Property Management, LLC and Ms. Kim Gunselman (hereinafter collectively, the Gunselman Realty), agree as follows:

1. The client hereby employs the Gunselman Realty and Property Management, LLC and Ms. Kim Gunselman to represent, advice, and perform real estate related professional services for the client on matters related to bring in tenants and related matters. The address of the subject property is 5700 Salem Run Blvd Spotsylvania VA 22407.

2. The services to be performed by the Gunselman Realty under this contract include the following:

   a. Provide professional service to bring in new tenants

   b. Any other related professional services related to bring in new tenants.

3. The client agrees to compensate the Gunselman Realty for services performed under this contract as follows:

   a. If the Gunselman Realty is acting as a dual agent the Debtor agrees to pay commission of 3% of the total basic rent payment for the 5-year lease term

   b. If the Gunselman Realty is the listing agent and there is another leasing agent the Debtor agrees to pay commission of 4% of the total basic rent payment for the 5-year lease term.

4. The client has never paid before on this matter

5. The Gunselman Realty warrants that the Gunselman Realty and Property Management, LLC and Ms. Kim is knowledgeable in the fields of real estate market and is experienced in bringing in new tenants; that the Gunselman Realty has no connection with the client, the client's creditors, any other party in interest, lawyer Weon G Kim and accountants, the United States trustee, or any person employed in the office of the United States trustee that would preclude the Gunselman Realty from representing the client as a debtor in possession in a Chapter 11 case; and that the Gunselman Realty does not hold or represent an interest that would be adverse to the interest of the estate in a chapter 11 case.

6. The Gunselman Realty agrees to fully account for all compensation that it will be receiving from the Debtor under this contract

8. Either party may terminate this contract at any time, subject to the approval of the bankruptcy court, if necessary.

1

Exhibit A-2

IN WITNESS WHEREOF, the parties have executed this contract on the  17th day of December,
2014

/s/ Weon G. Kim
by, Weon G. Kim
on behalf of Debtor
Weon G. Kim Law Office
8200 Greensboro Dr. #900
McLean VA 22102

/s/ Kim Gunselman
by, Ms. Kim Gunselman
President of Gunselman Realty and Property Management.

2

# LEASE

**THIS LEASE entered into this ____ day of December, 2014, between MDM Properties, LLC ("Landlord"), and Robert T. Ashe and Rachel L. Ward (collectively "Tenant"):**

**WITNESSETH THAT:**

Landlord hereby leases to Tenant and Tenant leases from Landlord for the term, at the rental, and upon all of the conditions set forth herein, that certain real property situated in the County of Spotsylvania, State of Virginia, which real property is commonly known as 5700 Salem Run Boulevard, Fredericksburg, VA 22407-7122, is further described in Exhibit "A" attached hereto and incorporated herein by this reference, and is hereinafter referred to as the "Premises". The Premises includes, without limitation, the land, building with floor area approximately 3,480 square feet, the parking lot, all easements, common area rights, rights of ingress and egress, additional parking rights, and all other rights thereunto belonging.

**ARTICLE 1. TERM.**

Section 1. The initial term of this Lease shall commence on or about January 1, 2015 ("Rent Commencement", subject to the following Section 1.2) and shall end five (5) years thereafter.

Section 2. Notwithstanding the preceding Section 1.1, Rent Commencement shall occur twenty-five (25) days after the obtaining of all permits, licenses, and approvals in connection with Tenant's opening of its business and use of the Premises (as described in Section 5.1 below) with all Landlord's improvements completed (collectively the "Approvals"). Article 22 of this Lease covers Improvements to the Premises and delivery of possession to Tenant.

**ARTICLE 2. RENT.**

Section 1. Beginning at Rent Commencement, Tenant hereby agrees to pay to Landlord rent, in monthly payments (each such payment being referred to as the "Monthly Installment"), for the Premises in accordance with the Rent Schedule attached hereto as Exhibit "B" and incorporated herein by this reference. Each Monthly Installment shall be paid in advance on or before the first day of each month during the term of this Lease to Landlord at the address designated in Article 14 or at other such place as Landlord may designate in writing.

Section 2. If Rent Commencement shall occur on a day other than the first day of the month, then the first day of the following month shall be deemed to be the first day of the initial term of this Lease and the first month's rent under this Lease shall apply to such month. Tenant shall pay Landlord pro-rata rent representing the number of days from the date of Rent Commencement until the end of the month in which Rent Commencement occurs.

**ARTICLE 3. REAL ESTATE TAXES.**

Tenant: _RTA_ _RLW_

Landlord: _SK_ _YL_

FSL 2014

| 2

Tenant shall reimburse Landlord, at the time of payment of each Monthly installment, one-twelfth (1/12) of the annual real estate taxes on the Premises, provided Landlord supplies Tenant with any real estate tax bill(s) within thirty (30) days of billing by the taxing authority. Landlord shall hold all such monthly payments of taxes from Tenant in trust and make all required tax payments during the term and any Renewal Terms directly to the taxing authority, keeping the Premises free of all tax liens and similar encumbrances.

## ARTICLE 4.   INITIAL DEPOSIT.

Tenant, simultaneously with the execution of this Lease, deposits in trust with Landlord the sum of $4,500 (the "Initial Deposit"), one-half of which represents the first month's rent under this Lease, to be applied by Landlord when such is earned pursuant to this Lease after execution and delivery to Tenant, and one-half of which Landlord shall hold after such execution and delivery as a security deposit (the "Security Deposit") for the faithful performance of Tenant's obligations hereunder. Landlord agrees that, in the event there are no uncured defaults under this Lease and the Premises are in good condition and repair (reasonable wear and tear excepted) at the expiration of the term hereof, it will refund the Security Deposit to Tenant within thirty (30) days following receipt of possession of the Premises from Tenant.

## ARTICLE 5.   USE OF THE PREMISES.

Section 1.   Tenant shall use the Premises solely for the operation of an All Tune and Lube Center (including, without limitation, the selling and/or providing of those goods and services shown on the attached Schedule I) and such other test programs and/or franchises as Tenant's franchisor ATL International, Inc. ("ATL") shall require or authorize. The Center shall only do business under the trade name All Tune and Lube® and/or such other marks and trade names as ATL shall require or authorize. During the term and any renewals, Landlord shall not lease, or otherwise permit the occupancy of, any part of any property owned or controlled by Landlord or any affiliated Party within 2,500 feet of the Premises to any person, corporation, or other entity which sells or provides any of those services which are designated by an asterisk on Schedule I.

Section 2.   Tenant shall keep the Premises in good order and free from garbage at all times and shall pay all charges for garbage collection, water, gas, sewage disposal, electricity, and for all other utilities it uses in connection with the Premises.

## ARTICLE 6.   MAINTENANCE.

Section 1.   Landlord shall at all times and at its own cost keep the foundation, the outer walls, the exterior and structural elements, and the roof of the building portion of the Premises in good repair, including but not limited to replacements, as necessary. Landlord's exterior maintenance obligation shall extend to the parking lot and to any curbing or conduit which the appropriate governmental body does not maintain. This Lease is subject to there being at least ten (10) on-site paved parking spaces belonging to the Premises for Tenant's exclusive use.

Tenant: _RA   TW_                                          FSL 2014

Landlord: _JK  YK_                                                    | 2

**Section 2.**  Tenant shall at all times and at its own cost keep the Premises in good order and in a clean, sanitary and safe condition, and shall make necessary repairs as to the interior of the Premises, and the fixtures and equipment therein, including the exterior and interior windows, doors, locks and entrances, signs, the lighting, the heating, the ventilation and air conditioning, and the plumbing.  Notwithstanding the foregoing, Landlord represents and warrants that the lighting, the heating, the ventilation and air conditioning, and the plumbing in the Premises therein, which are part of this Lease, meet applicable code and industry standards and are in good working order as of the execution of this Lease, and shall remain so for ninety (90) days following Rent Commencement.  Landlord further represents and warrants that the electrical and the mechanical system(s) in the Premises meet applicable code, are in good working order as of the execution of this Lease, and shall remain so for ninety (90) days following Rent Commencement.  Landlord agrees, within fifteen (15) days of its receipt of notice from Tenant within the above-referenced ninety-day warranty period to completely correct and remedy at Landlord's expense any deficiencies or defects regarding the system(s) or equipment which is the subject of such warranties.

**Section 3.**  Tenant shall be permitted to store, handle and dispose of substances which may be regulated or defined as "hazardous" under applicable laws and regulations as long as Tenant does so in compliance with the applicable laws and regulations.  Tenant represents and warrants that Tenant shall at all times during the term of this Lease be in compliance with all such laws and regulations and shall indemnify, defend and hold Landlord and Tenant's franchisor ATL harmless from and against any and all claims, liabilities, losses, damages, costs and expenses, including but not limited to civil and criminal fines, penalties and interest, Superfund liability, clean-up costs, and reasonable attorney, environmental consultant, engineering, and expert fees, arising out of or in connection with any environmental contamination caused by Tenant in violation of this Section.

**Section 4.**  Landlord hereby indemnifies, defends, and holds Tenant and Tenant's franchisor ATL harmless from and against any and all claims, liabilities, losses, damages, costs and expenses, including but not limited to civil and criminal fines, penalties and interest, Superfund liability, clean-up costs, and reasonable attorney, environmental consultant, engineering, and expert fees, (collectively "Claims") arising out of or in connection with any environmental condition or contamination which exists on the Premises as of Rent Commencement, or which is due to any act or omission of Landlord and/or prior lessees/occupants of the Premises.  Without limiting the generality of the foregoing, Landlord understands and agrees that such duty to indemnify, defend and hold harmless extends, without limitation, to any Claim(s) asserted by any third party including, without limitation, any adjoining property owner or any governmental entity, and in the event any governmental entity requires or demands the closure or removal (pursuant to any federal, state, or local law, rule, or regulation) of any underground storage tank(s), pipe(s) or other underground container(s) in, on or under the Premises, then any and all expenses associated therewith shall be the responsibility of Landlord.  Tenant, in consideration of the above, agrees not to install any underground storage

Tenant:  RIA ___

Landlord:  JK YK

FSL 2014

| 3

tanks in, on, or under the Premises at any time during the term or any renewals under this Lease, and Landlord and Tenant agree that Tenant is not, and has not been, an underground storage tank operator with regard to any of the underground storage tanks (if any) now or formerly on the Premises which Landlord warrants have been removed, abandoned, or closed by Landlord in accordance with applicable law and regulations.

**Section 5.** At the termination of this Lease, Tenant shall surrender the Premises in good condition and repair, reasonable wear and tear excepted.

## ARTICLE 7. CONSENTS/APPROVALS.

Wherever any provision of this Lease calls for the giving of consent or approval by either Landlord or Tenant, such consent or approval shall not be unreasonably withheld nor unreasonably delayed.

## ARTICLE 8. TENANT'S PERSONAL PROPERTY.

Landlord hereby consents to Tenant's installation and use of all ATL-approved equipment, trade fixtures and signs on the Premises. Landlord further consents to Tenant's use of the standard All Tune and Lube interior and exterior signs, subject to applicable governmental code. Landlord hereby waives any and all rights it may have under applicable law with respect to Tenant's equipment, inventory, trade fixtures, signs, and/or other personal property (collectively "Tenant's Personal Property") and agrees to execute such forms of waiver or other instruments as Tenant's lenders and/or equipment lessors having security or ownership interests in Tenant's Personal Property may require.

## ARTICLE 9. TENANT'S RENEWAL OPTIONS.

Notwithstanding Article 1, Tenant, in its sole option, may extend the initial term of this Lease for two (2) consecutive periods of five (5) years each ("Renewal Terms", such five (5) year periods being known consecutively as the "First", "Second", etc. "Renewal Term"). The initial term shall automatically be extended for each Renewal Term unless the Tenant shall give written notice to the Landlord of its intention to terminate this Lease at least ninety (90) days prior to the expiration of the then existing term. The word "term", as used throughout this Lease, means and includes the "Initial term" and any "Renewal Term".

## ARTICLE 10. FINANCIAL CONTINGENCY.

This lease shall be contingent on Tenant obtaining the necessary funds to finance its All Tune and Lube Center. If Tenant cannot obtain the aforementioned funds by Lease signing date, then this lease shall be terminated and Tenant and Landlord shall have no further obligation to one another.

## ARTICLE 11. INSURANCE.

Tenant: _RTA Pww_

Landlord: _JK YK_

FSL 2014

| 4

**Section 1.**  Tenant shall keep in effect a policy of public liability insurance with respect to the Premises and business operated by Tenant, with combined single limit of liability not less than Two Million Dollars ($2,000,000) (which limit may be reached, at Tenant's option, through the purchase of an umbrella policy) for bodily injury and property damage, with Tenant, Landlord and ATL named as insured as their respective interests may appear.   Tenant shall furnish Landlord with a certificate of insurance or other acceptable evidence that such insurance is in force, and evidence that its premiums have been paid by Tenant within ten (10) days prior to each due date.

**Section 2.**  Tenant shall keep in effect policies of insurance against loss by fire, extended coverage, vandalism, and malicious mischief, at one hundred percent (100%) of replacement value, as to the following:  (a) upon the building portion of the Premises and (b) upon all of the plate glass in the building, with Landlord and Tenant named as insured as their respective interests may appear.  Tenant shall furnish Landlord with a certificate of insurance or other acceptable evidence that such insurance is in force, and evidence that the premiums have been paid by Tenant within ten (10) days prior to each due date.

**Section 3.**  Except as required in this Article 10, Tenant shall have no responsibility for keeping insurance policies in force.  Tenant and Landlord each waives any and all rights of recovery against the other, or against the officers, employees, agents and representatives of the other, for loss of or damage to such waiving party or its property or the property of others under its control, where such loss or damage is insured against under any insurance policy in force at the time of such loss or damage.  Tenant and Landlord shall, upon obtaining the policies of insurance required hereunder, give notice to the insurance carriers that the foregoing mutual waiver of subrogation is contained in this Lease.

**ARTICLE 12.  ASSIGNMENT.**

Subject to Section 15.2, Tenant may assign this Lease or sublet the Premises (or any part thereof) with the written consent of Landlord, which consent shall neither be unreasonably withheld nor delayed.

**ARTICLE 13.  ENTRY UPON THE PREMISES.**

Landlord shall have the right upon reasonable notice (at least twenty-four hours) to enter upon the Premises during Tenant's normal business hours for the purpose of inspecting same or for making repairs, additions or alterations, provided that no such entry, inspection, repairs, etc. shall unreasonably interfere with Tenant's business.  For a period commencing ninety (90) days prior to the expiration of this Lease, Landlord may have reasonable access to the Premises for the purpose of exhibiting the same to prospective tenants.  Notwithstanding the foregoing, ATL shall have the right to enter the Premises to protect its Proprietary Marks in accordance with the franchise agreement between Tenant and ATL.

**ARTICLE 14.  CONDEMNATION/CASUALTY.**

Tenant:  RTA TW

Landlord:  JE  VK

FSL 2014

| 5

If any condemnation (or conveyance in lieu thereof) or damage by fire (or other casualty) renders the Premises substantially unsuitable for Tenant's use, then either Landlord or Tenant shall have the right to terminate this Lease as of the date of any such occurrence by giving written notice to the other within thirty (30) days of the date thereof. If this Lease is terminated pursuant to this Article, any rental, real estate tax obligation, the Security Deposit then held by Landlord, and any other monies paid in advance by Tenant shall be refunded forthwith by Landlord to Tenant. If this Lease shall not be terminated as herein provided, Landlord shall, at its sole expense, forthwith and with due diligence, promptly repair and restore the Premises to a complete unit of substantially like quality and character as existed prior to the condemnation or casualty, and the rental, real estate tax obligation, and other charges due under this Lease shall abate from the date of such occurrence until completion of such repair and restoration. All damages awarded for any condemnation shall belong to Landlord, provided however, that Landlord shall not be entitled to any portion of the condemnation award made to Tenant for the cost or loss to Tenant's business, leasehold improvements, and immoveable trade fixtures and for the cost of removal of Tenant's Personal Property.

## ARTICLE 15. NOTICE.

Any and all notices required or permitted under this Lease shall be in writing and shall be served, postage pre-paid by the sender, Certified Mail-Return Receipt Requested to the respective parties at the below addresses unless and until a different address has been designated by written notice to the other party:

| LANDLORD: | TENANT: |
|---|---|
| MDM Properties, LLC | Robert Ashe and Rachel Ward |
| 4536 Plank Road | 49 Stableside Lane |
| Fredericksburg, VA 22407 | Fredericksburg, VA 22405-3649 |

In all cases where notice is required or permitted under this Lease, ATL shall be given concurrent identical notice in the prescribed manner to 8334 Veterans Highway, Millersville, MD  21108, Attn: Legal Department, or such other address as ATL shall designate in writing.

## ARTICLE 16. DEFAULT.

Section 1.  The following events shall constitute a "Default" by Tenant under this Lease:

    (a)  The failure to pay any Monthly Installment, or any other amount constituting rent by Tenant, if such failure to pay shall continue ten (10) days after written notice thereof is received by Tenant.

    (b)  The failure of Tenant to perform any other material covenant or condition contained in this Lease, if such failure to perform continues thirty (30) days after written notice thereof is received by Tenant, provided, however, that if said default cannot be reasonably cured within the thirty (30) day period,

Tenant: RTA  [initials]

Landlord: JF  VK

FSL 2014

|6

Tenant shall not be in default if Tenant commences a cure within thirty (30) days and diligently pursues such cure to completion.

**Section 2.** Before (i) the exercise by Landlord of any of its remedies upon Tenant's Default, (ii) the consent by Landlord to Tenant's use of any trade name not authorized by ATL, (iii) the consent by Landlord to any assignment or subletting by Tenant, and/or (iv) execution by or consent of Landlord to any cancellation or Termination (whether mutual or otherwise) of the Lease or Tenant's right to possession of the Premises, Landlord shall give ATL concurrent written notice of any such default, proposed use and/or assignment/subletting, and ATL shall have for thirty (30) days from its receipt of such written notice, the option, but not the obligation, to procure or approve the assignment of this Lease to one of its franchisees.

**Section 3.** Upon the occurrence of any Default, Landlord may exercise any or all of the following remedies, subject to the provisions of the preceding Section 15.2:

(a) Sue for and recover the rent due under this Lease, or pursue any claim for damages for failure to perform any material covenant or condition;

(b) Enter upon the Premises and, if it shall so desire, expel the Tenant and those claiming under it without being guilty of any manner of trespass, and rent the Premises as Tenant's agent, applying the proceeds of such rentals on account of the rent and other sums due from the Tenant; or

(c) Enter upon the Premises and to declare this Lease at an end, and in such case, to expel the Tenant and those claiming under it without being deemed guilty of trespass, and thenceforth hold and enjoy the Premises on its own account.

**Section 4.** In addition to the foregoing, in the event of Tenant's failure to pay any amounts due under this Lease, such delinquent amounts shall be subject to a late charge computed at a rate of 18% per annum (but not less than $10.00) from the due date until the date of actual payment as additional rent.

**Section 5.** If Landlord shall breach or be in default of any of the provisions of this Lease, Tenant may in its option send written notice thereof to Landlord. Landlord shall have thirty (30) days from its receipt of notice to remedy completely any such breach or default of this Lease. If such complete remedy is not accomplished by Landlord within the thirty (30) day period (provided that if such complete remedy is of such a nature that it reasonably would require more than thirty (30) days to complete, then Landlord shall have a reasonable time for completion as long as Landlord commences the remedy within the thirty (30) day period and diligently prosecutes it to completion), then Tenant may exercise its remedies at law or in equity, which shall include, without limitation, termination of this Lease effective immediately upon written notice to Landlord. Upon any termination by Tenant pursuant to this Section 15.5, Landlord shall promptly return any and all deposits held by Landlord to Tenant, Landlord and Tenant shall adjust the Monthly Installment then due or already held by Landlord to reflect the termination date as per the notice, Tenant shall have the option of removing so much of Tenant's

Tenant: _____

Landlord: _____

FSL 2014

17

Personal Property as it shall desire from the Premises, and neither party shall have any further liability to the other.

**ARTICLE 17. QUIET ENJOYMENT.**

Upon due performance of the covenants and conditions to be performed by Tenant under this Lease, Landlord covenants that Tenant shall and may at all times peaceably and quietly have, hold and enjoy the Premises during the term and any Renewal Terms of this Lease.

**ARTICLE 18. CONDITIONS PRECEDENT.**

The following is a condition precedent to Tenant's obligations and duty to pay rent under this Lease: any and all Approvals (as defined in Section 1.2) shall be in effect or obtained within sixty (60) days of the date of this Lease. Landlord covenants that it shall exert best efforts in cooperating with Tenant in obtaining all Approvals (including, without limitation, signing any necessary applications or letters and providing any relevant information needed in any Approval process). In the event the foregoing condition precedent has not been fully satisfied, then Tenant shall have the option of terminating this Lease by sending written notice to Landlord. Upon the receipt of any such notice, Landlord shall promptly return to Tenant any and all Tenant deposits held by Landlord, and neither Landlord nor Tenant shall have any further liability to the other.

**ARTICLE 19. SUBORDINATION.**

Tenant agrees that this Lease shall be subordinate to any mortgage which may now or hereafter affect the real property of which the Premises form a part and to all renewals, replacements, assignments and extensions thereof, provided that any such mortgage shall provide that this Lease shall not be extinguished or terminated by foreclosure or otherwise by means of any such mortgage as long as Tenant is not in default under this Lease. In the event any mortgagee or other party acquires title to the Premises through foreclosure or otherwise by means of any such mortgage, Tenant shall attorn to the interest of any such acquiring party; provided such party, in consideration of the covenants of subordination and attornment contained herein, shall not disturb Tenant's peaceful possession of the Premises nor shall this Lease be extinguished or terminated as long as Tenant is not in default under this Lease. The subordination, attornment, and non-disturbance agreement contained herein shall be self-operative and no further instrument shall be required to be executed by any party. In confirmation of such agreement, Tenant agrees to execute within a reasonable time any certificate which Landlord or any mortgagee shall reasonably request.

**ARTICLE 20. EXCUSE OF PERFORMANCE.**

Neither party shall be deemed in default with respect to the part- or non-performance of any of the terms, covenants, or conditions of this Lease if such part- or non-performance shall be due to any strike, lockout, civil commotion, war-like operation, invasion, rebellion, hostilities, military or usurped power, governmental regulations or

Tenant: RTA TW                                                            FSL 2014

Landlord: JF YE                                                          | 8

controls, inability to obtain any material, service or financing, through Act of God or other cause beyond the control of such party.

### ARTICLE 21. RIGHT OF FIRST REFUSAL.

If during the initial term or any Renewal Terms of this Lease, Landlord shall receive one or more bona fide offers to purchase the Premises or any part thereof as shown in Exhibit A, which offers are acceptable to Landlord, Landlord agrees that Tenant, and/or assigns shall have and is hereby granted options to purchase upon the same terms and conditions. Landlord agrees immediately upon receipt of any such offer to give Tenant written notice of the terms and conditions thereof, and that Tenant may exercise its option to purchase hereunder at any time by giving written notice of exercise within thirty (30) days from the date the Landlord's notice is received. The Tenant warrants and represents that Gunselman Realty & Property Management is the listing agent in this transaction. The Tenant agrees to hold landlord harmless against any claims for any ~~brokerage commission, as a result of any action by the tenant. The landlord will pay~~ Gunselman Realty & Property Management a commission in accordance with a separate exclusive right to lease or sell listing agreement (in the event of purchase by this tenant). A contract of sale shall then be executed by the parties and title shall be closed within a reasonable time thereafter. If Tenant should fail to exercise its option hereunder, then the Premises shall convey, if at all, subject to the tenancy created by this Lease. If Tenant should fail to exercise and the Premises does not convey pursuant to the offer in question, then Tenant shall continue to have options to purchase in accordance with the terms of this Article 20.

### ARTICLE 22. FRANCHISOR REVIEW.

In accordance with the franchise agreement between Tenant's franchisor ATL and Tenant, this Lease is subject to the approval of ATL. After this Lease has been fully executed by Landlord and Tenant, Landlord shall forward a fully executed copy to ATL for review. The contingency contained in this Article 22 shall be waived unless ATL sends written notice of disapproval to Landlord and Tenant within five (5) business days of its receipt of the fully executed Lease copy. Landlord and Tenant hereby acknowledge that ATL reviews this Lease only to meet the requirements of the franchise agreement, and that neither ATL nor any of its officers or employees shall be deemed to have served as Tenant's attorney or professional advisor. Landlord and Tenant hereby represent that each has had the opportunity to have an attorney or professional advisor of its choosing review this Lease. Landlord and Tenant hereby represent that each has participated in the drafting of this Lease and that each has had the opportunity to have an attorney or professional advisor of its choosing review this Lease. Accordingly, any rule of law providing that ambiguities shall be construed against the drafting party shall be of no force and effect.

### ARTICLE 23. IMPROVEMENTS/DELIVERY OF POSSESSION.

Landlord agrees that it will supply at its own expense Landlord's improvements as more particularly set forth on Exhibit "C" attached. Landlord agrees to exert best efforts in

Tenant:

Landlord:

FSL 2014

| 9

completing Landlord's improvements in order that Tenant may open for business on or before the date specified in Section 1.1 (the "Target Date"). Landlord shall perform Landlord's improvements in accordance with all federal, state, and local requirements including, without limitation, the obtaining of all permits, licenses, certificates, and inspections. Landlord shall deliver exclusive possession of the Premises to Tenant upon the execution and delivery of this Lease by Landlord and Tenant. If Landlord is unable to deliver exclusive possession of the Premises to Tenant with all such permits, licenses, certificates, and inspections obtained as to the completed Landlord's improvements at least twenty-five (25) days prior to the Target Date, then Rent Commencement (and Tenant's liability for rent) shall be abated one (1) day for each day's delay in such delivery. Tenant shall have the right, without obtaining Landlord's consent, to perform at Tenant's expense non-structural improvements and alterations to the Premises having a cost of less than $5,000 which Tenant deems advisable.

## ARTICLE 24. ENTIRE AGREEMENT.

This Lease, together with Exhibits "A", "B", "C", and Schedule I, sets forth all the promises, agreements, conditions and understandings between Landlord and Tenant relative to the Premises, and there are no promises, agreements, conditions or understandings, either oral or written, expressed or implied, between them, other than as herein set forth. This Lease shall inure to the benefit of the parties and their respective heirs, successors, and assigns. Except as herein otherwise provided, no subsequent alterations, amendments, changes or additions to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by both of them. The person(s) executing this Lease on behalf of each party hereby represent and warrant to the other party that such execution has been duly authorized by all requisite action of the executing party in order that, upon execution, this Lease will be binding upon and enforceable against the executing party in accordance with its terms.

WITNESS:

Landlord:
MDM Properties, LLC

By:

Tenant:

By: _Robert T Ashe_
Robert T. Ashe

By: _____
Rachel L. Ward

Tenant: RTA
Landlord: JK YK

FSL 2014

| 10

# SCHEDULE I

1. Engine Tune-Ups •
2. Engine Diagnostic Services •
3. Inspect and replace oil •
4. Inspect and replace air filters and cabin filters •
5. Inspect and replace PVC filters •
6. Inspect and replace fuel filters •
7. Inspect and replace canister filters •
8. Inspect and replace transmission fluid, filters, and gaskets •
9. Inspect and replace belts and hoses •
10. Inspect and replace differential fluid •
11. Inspect and replace radiator fluid •
12. Repair air conditioning system and/or charge freon •
13. Cleanse and repair fuel injection system •
14. Inspect, cleanse, repair, replace, and rebuild carburetor as necessary •
15. Inspect and replace O2 sensors •
16. Inspect and replace other sensors and other computer components •
17. Inspect and replace distributor vacuum advance •
18. Inspect and replace choke pull offs •
19. Inspect and replace EGR valves •
20. Brake inspection, repair, replacement, and maintenance (e.g. clean and adjust) services •
21. Inspect and replace distributor cap •
22. Inspect and replace distributor rotor •
23. Inspect and replace wires •
24. Inspect and replace CV joints and boots •
25. Inspect, repair, and replace water pumps, fuel pumps, and valve cover gaskets and any other repairs or replacements regarding the automotive engine or transmission or any part thereof •
26. Emissions/exhaust repair, replacement and testing services •
27. Shock, struts, and wheel alignment services •
28. Remove and replace Engine or Transmission •

• Denotes services that are subject to the exclusivity protection set forth in Section 5 of the Lease.

[Type text]

**EXHIBIT "A"**

**(PREMISES/SITE PLAN)**

[Type text]

## EXHIBIT "B"

## (RENT SCHEDULE)

## 5700 SALEM RUN BOULEVARD, FREDERICKSBURG, VA 22407-7122

| YEAR(S) | MONTHLY INSTALLMENT |
|---------|---------------------|
| 1* | $4,350 |
| 2 | $4,480 |
| 3 | $4,615 |
| 4 | $4,753 |
| 5 | $4,895 |
| **FIRST RENEWAL TERM** | |
| 6 - 10 | Base Rent shall be increased by three percent (3%) over the preceding year |
| **SECOND RENEWAL TERM** | |
| 11 – 15 | Base Rent shall be increased by three percent (3%) over the preceding year |

**\*Rent payments shall commence on March 1, 2015**

Tenant: _RVA YGL_
Landlord: _OK YK_

**EXHIBIT "C"**

**(LANDLORD'S IMPROVEMENTS)**

**Landlord, at Landlord's sole expense, shall complete the following Landlord Improvements:**

- **Complete any repairs/improvements necessary for tenant to receive the Certificate of Occupancy.**

Tenant: _RTA_  
Landlord: _YL_