# United States Bankruptcy Court
## Eastern District of Virginia
### at Alexandria Division

In Re:

    M.D.M. Property, LLC   :               Chapter 11

    Debtor       :              Case No. 14-13987 RGM

## APPLICATION FOR AUTHORIZATION OF A REAL ESTATE PROFESSIONAL COMPENSATION

Weon G Kim, counsel for M.D.M. Property, LLC, pursuant to 11 U.S.C. §330 and §331, Rule 2016 (a) of the Federal Rules of Bankruptcy Procedure and Local Rule 2016-1, hereby applies for allowance of compensation of $4,770 to be paid over 12-month period starting from 05/01/2016 for professional services rendered in retaining new tenants. In support of this application, the applicant and Counsel Weon G Kim respectfully states as follows:

## CASE HISTORY

1. On October 28, 2014 the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  The Debtor has remained in possession of its assets and is now operating its business as a Debtor in Possession.

## APPLICATION FOR COMPENSATION FOR A REAL ESTATE PROFESSIONAL FEE AND COSTS

2. The Debtor has retained Gunselman Realty and Property Management, LLC and Kim Gunselman as a REAL ESTATE PROFESSIONAL in bringing in tenants.

3. The REAL ESTATE PROFESSIONAL has worked for the Debtor and Estate and retained a new tenant as seen at the attached lease contract and The Debtor is still looking for bringing in additional new tenants.

4. The applicant is now making application of compensation herein for a real estate professional in bringing in new tenants whose lease contract attached hereto together with the fee agreement.

5. The Debtor agrees to compensate the REAL ESTATE PROFESSIONAL for services performed under this contract as follows:

   a. If the REAL ESTATE PROFESSIONAL is acting as a dual agent the Debtor agrees to pay commission of 3% of the total basic rent payment for the 5-year lease term.

   b. If the REAL ESTATE PROFESSIONAL is the listing agent and there is another leasing agent the Debtor agrees to pay commission of 4% of the total basic rent payment for the 5-year lease term.

   c. The aforesaid fee is to be paid over 12-month period.

6. The REAL ESTATE PROFESSIONAL has never been paid before on this matter

7. Upon information and belief, the REAL ESTATE PROFESSIONAL has been working for Debtor as a listing agent the another agent was working as a leasing agent. Both worked together in bringing in a new tenant.

8. The basic rent payment for the 5-year lease term goes in the sum of $159,000 which is five times of $31,800 given the 5 year lease term and $31,800 for the yearly rent.

2

9. The amount of the commission to be paid to the REAL ESTATE PROFESSIONAL is $4,770
   which amounts to 3% of the sum of $159,000.

10. The services performed by the REAL ESTATE PROFESSIONAL have benefited the Estate and the Debtor and accordingly this counsel asks for compensation for said services.

11. The REAL ESTATE PROFESSIONAL has received no promises to have their fees paid by third parties. All payments are being applied for through the Court and payment is to be made by the Debtor and/or its Estate from funds being held on DIP account or income from the Debtor.

12. The counsel respectfully provides this Court with the following pertinent information: Lease contract and Listing agreement.

## LEGAL STANDARD

13. This court must review the reasonableness of the fees of the REAL ESTATE PROFESSIONAL based on whether (a) the services were reasonable at the time provided and (b) the services provided benefited or could have benefited the Debtor or the Estate. Based on the proper standard and the record of this proceeding, the fees requested in this case are reasonable.

14. All professional services taken by the REAL ESTATE PROFESSIONAL in this case were at the direction or on behalf of the Debtor and Estate.

15. Section 11 U.S.C. §330(a) (3) enumerates factors to consider in reviewing the propriety of requests for compensation of professionals. The factors are (a) the time spent; (b) the rates charged; (c) whether the services were necessary to the administration of, or beneficial toward the completion of, the case; (d) whether the

3

services were performed within a reasonable amount of time commensurate with the complexity, importance and nature of the issue or task presented; and (e) whether compensation is reasonable based on customary fees charged by comparably skilled practitioners in case other than bankruptcy cases. The counsel hereby assures that this application satisfies the required guidelines and the requirements on the above code.

16. Counsel's application for compensation is made pursuant to the guidelines originally enumerated in Johnson v. Georgia Highway Express Inc., 488 F.2d 714 (5th Cir. 1974) and expressly adopted by this Circuit in Barber v. Kimbrells, Inc. 577 F.2d 216,226 (4th Cir. 1978), cert. denied, 439 U.S. 934; Harman v. Levin, 772 F.2d 1150 (4th Cir. 1985); and Daly v. Hill, 790 F.2d 1071 (4th Cir. 1986).

WHEREFORE, the undersigned counsel prays that this Court enter an Order authorizing the total payment of $4,770 to be paid over 12-month period for professional services rendered by a Real Estate Professional and for such other relief as the Court deems just and proper.

Dated: July 1, 2015.

LAW OFFICE OF WEON G KIM

/s/ Weon G. Kim
Weon G. Kim (VSB#73104)
8200 Greensboro Dr. Ste. 900
McLean, VA 22102
Jkkchadol99@gmail.com
Tel (571) 278-3728
Fax (703)462-5459

## CERTIFICATE OF SERVICE

I hereby certify that the above fee Application for REAL ESTATE PROFESSIONAL were served by USPS regular mail upon the creditors below listed and posting at ECF on July 1, 2015:

Respectfully submitted,

By, /s/ Kim Weon Geun
WEON G. KIM VSB #73104
8200 Greensboro Dr. #900
McLean VA 22102
571-278-3728,Fax 703-462-5459
JKKCHADOL99@GMAIL.COM

Annemarie G McGavin
Buchanan Ingersoll and Rooney PC
1700 K Street NW #300
Washington D.C. 20006-3807

Buchanan Ingersoll and Rooeny PC
c/o William Garvin, esq.
1700 K Street N.W. #300
Washington D.C. 20006

Gunselman Realty Property Management LLC
4536 Plank Rd
Fredericksburg VA 22407

Internal Revenue Service
PO Box 7346
Philadelphia PA 19101-7346

Spotsylvania County Commissioner of Revenue
c/o Real Estate Division
PO Box 175
Spotsylvania VA 225553-0175

Timothy P Palmer, esq
Buchanan Ingersoll and Rooney PC
One Oxford Center
301 Grant Street 20th Floor
Pittsburgh PA 15219

VA Department of Taxation
PO Box 26685
Richmond VA 23261-6685

Wilshire State Bank
3200 Wilshire Blvd
Los Angeles CA 90010

Exhibit A-1

REALTOR®

# Virginia Association of Realtors®
# COMMERCIAL LISTING AGREEMENT
## (TO SELL OR LEASE)

Firm Name GUNSELMAN REALTY & PROPERTY MANAGEMENT
Address 4536 PLANK RD.
City/State/Zip FREDERICKSBURG, VA 22407

**1. EXCLUSIVE RIGHT:** The undersigned owner (the "Owner") MDM PROPERTIES hereby grants unto the above named firm as broker (the "Broker") for and in consideration of the services to be rendered by Broker, the exclusive and irrevocable right and privilege commencing on December 15, 2014 and terminating on December 14, 2016 (the "Listing Period") to [check all applicable]: ☐ sell ☒ lease the property described herein for the price and upon the terms and conditions as set forth herein.

Property located in City/County SPOTSYLVANIA, Virginia, commonly known as:
(Street Address) 5700 Salem Run Blvd
(Legal Description) 2391-A-0
together with all improvements thereon and fixtures attached thereto, and all easements, rights, and appurtenances thereunto belonging, including any right, title and interest of Owner in and to the adjacent streets, alleys or rights-of-way (the "Property"). Owner shall furnish Broker with all pertinent information relating to the Property.

**2. LISTING PRICE AND TERMS:**

~~A. Sale. If the Property is listed for sale with Broker, the sales price of the Property shall be $______ or such other price, terms or conditions as may be hereafter agreed upon in writing by Owner. Possession of the Property shall be at settlement unless otherwise agreed by Owner and purchaser.~~

B. Lease. If the Property is listed for lease with Broker, the rental price for the Property shall be [select one]:
$15.00 per square foot or $ N/A per month, plus common area maintenance ("CAM") charges of $ 3.00/PSF, if applicable. Real property taxes and property insurance shall be paid by TENANT. Other rental terms: SUITE #100 - [GARAGE 3,480 SQ FT] ($4350/MO $870/NNN) [SUITE #102 SALON] - 1500 SQ FT($1875/MO $375/NNN), [SUITE #106 RESTAURANT] - 1500 SQ FT

C. ~~Agent for Collection of Rent. [Check if applicable]:~~ ☐ ~~Owner does hereby appoint Broker, its successors or assigns, as Owner's agent to collect all rent during the term of the Lease and/or any renewals or extensions thereof, upon the terms and conditions set forth in the lease. Broker shall deduct the compensation due to Broker as set forth in paragraph 4 below and remit the balance to Owner within thirty (30) days. In no event shall Broker be liable to Owner for any tenant's nonpayment of rent or other breach of lease.~~

**3. EXTENSION:** This Listing Period shall automatically extend and renew from month to month following the expiration of the Listing Period unless either party shall give the other written notice of termination at least thirty (30) days prior to the expiration of the Listing Period or any extension period, whichever is applicable.

4. ~~COMPENSATION:~~ *See paragraph 15* (+TW)

A. ~~Commission.~~ ~~If, at any time during the term of this Listing Agreement, Owner sells, transfers or leases the Property or enters into a contract to sell, transfer or lease the Property to a purchaser or tenant, whichever is applicable, who is ready, willing and able to purchase or lease the Property on terms acceptable to Owner, or Owner receives an offer in writing signed by a purchaser or tenant by which such purchaser or tenant offers to purchase or lease the Property, whichever is applicable, on the terms and conditions set forth herein or otherwise acceptable to Owner, then Owner agrees to pay the Broker a broker's commission of~~

~~_____ percent ( _____ %) of the gross purchase price or gross lease price, whichever is applicable;~~

~~If the Property is sold, transferred or leased solely by Broker or otherwise is sold, transferred or leased by Owner without Broker. If the Property is sold, transferred or leased in conjunction with a co-broker, buyer's agent or tenant's agent, then Owner agrees to pay the Broker a broker's commission of~~

~~_____ percent ( _____ %) of the gross purchase price or lease price, whichever is applicable.~~

→ *after motion heard and approval by Bankruptcy Court with terms*

~~The compensation due to Broker pursuant to this paragraph (referred to herein as the "Fee") shall be payable to Broker in cash at settlement, if the Property is sold, or on the first day of each month during the lease term, if the Property is leased. Broker has advised Owner of Broker's general company policy regarding cooperating with and compensating other agents. If Owner withdraws the Property from the market or otherwise prevents Broker from selling or leasing the Property during the Listing Period or any extension thereof without written consent from Broker, Owner agrees to pay Broker the Fee for its services. As used herein, "gross lease price" shall mean: (i) the base rent of any lease plus amortized improvements, real estate taxes, insurance and CAM, if any, paid by the tenant during the entire term of the lease and any renewals or extensions of the lease; (ii) any new or replacement lease for the Property; and (iii) any other new or additional space and improvements later leased by the tenant in the same building, shopping center (including outparcels), warehouse or office complex as the Property.~~ *12-month project* √5-year

B. ~~Tenant's Purchase of Property.~~ If any tenant in the Property, or its principals, directly or indirectly, purchases or otherwise acquires ownership of the Property during the lease term or any renewal or extension thereof, or during any new or replacement lease, or for a period of *LEASE TERM PLUS 01 DAYS* ( X ) months thereafter, upon any terms, Broker, its successors or assigns, shall be deemed the procuring agent in the transaction and shall be paid a broker's commission of _____ *Fixed* _____ percent ( 5.000 %) of the gross purchase price at settlement by Owner. The foregoing provisions for the payment of the brokerage commission in connection with the Property are an integral part of any lease between Owner, as landlord, and the tenant, and a covenant which shall run with the Property, and shall be binding upon all successors or assigns of Owner and Owner's interest in the Property or any part thereof.

5. **FEE AFTER EXPIRATION.** Owner shall also pay the Fee to Broker if within one hundred eighty (180) days after the expiration of the Listing Period or any extension thereof the Property or any portion thereof is sold, transferred or leased to anyone: (i) with whom Broker or Owner has had contact during the Listing Period or any extension thereof regarding the sale or lease of the Property or any part thereof; or (ii) whose name appears on any list with whom Broker or Owner shall have had contact during the Listing Period or any extension thereof (the "Registration List"), provided Broker shall have provided such written Registration List to Owner within thirty (30) days following expiration of the Listing Period or extension thereof.

6. **ADVERTISING AND ACCESS.** Broker is authorized to advertise the Property and shall have the exclusive right to place a sign or signs on the Property if, in Broker's option, such would facilitate the sale or lease thereof. Owner agrees to make the Property available to Broker and real estate brokers and salespersons employed by or affiliated with Broker at all reasonable hours for showing to prospective purchasers or tenants. Owner also agrees to refer to Broker all inquiries or offers which Owner may receive regarding the Property during the Listing Period or any extension thereof.

VAR Form 710 (Rev. 1/13)                    2

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com   Salem Run

**7. OWNER'S REPRESENTATIONS.** Owner hereby warrants and represents unto Broker that: (a) Owner is the owner of the Property or has the legal authority to execute this Listing Agreement on behalf of the Owner; (b) no other person or entity has any right to purchase or lease the Property or any portion thereof by virtue of any agreement, authorization, option or right of first refusal; (c) the Property is not subject to the jurisdiction of any court in any bankruptcy, insolvency, conservatorship, receivership or probate proceeding; (d) Owner will cooperate fully with Broker in reviewing any agreements for the sale or leasing of the Property; (e) there are no other brokerage agreements between Owner and any other person or entity and that no potential purchasers or tenants have been in contact with Owner as the result of any prior brokerage agreement or similar commitment whatsoever; and (f) to the best of Owner's knowledge, no toxic or hazardous materials (as said terms are defined in any applicable federal or state laws) have been used, discharged or stored on or about the Property by the Owner, and to the best of the Owner's knowledge, no such toxic or hazardous materials are now or will be at settlement located on or below the surface of the Property. If any such toxic or hazardous materials are discovered at the Property contrary to the above warranty and representation, all costs of removal of same or expense of defending any action brought against the Broker by any individual, entity or governmental authority because of same shall be borne by Owner.

**8. INTERNET AND OTHER PUBLICATION:** Owner is aware that Broker, as a member of a Multiple Listing Service ("MLS"), may file the Property and information regarding it with the local MLS and Commercial Information Exchange ("CIE") if applicable, maintained by such MLS and other Internet databases maintained by third-parties. Owner understands that the CIE is a central repository of data regarding commercial properties for sale, lease or development and that the primary objective of the CIE is to distribute information about commercial property listings to all of its members. Broker and/or CIE may distribute or post listing information on websites, magazines and other types of advertising media. By initialing here _____, Owner desires to opt-out of Internet publication.

**9. RELATED BUSINESS AND SERVICES:** The Listing Broker and Selling Broker may engage in mortgage loan, title insurance, real estate settlement and other real estate related businesses and services from which they receive compensation during the course of this transaction, in addition to the real estate brokerage fees.

**10. BROKER'S LIABILITY:** Broker's duties and activities pursuant to this Listing Agreement will be limited to entry upon the Property to show and exhibit same to prospective purchasers and tenants, and to provide information with respect to the Property and its condition based on Broker's actual knowledge thereof. Owner agrees, at its sole cost and expense, to indemnify, defend and hold harmless Broker and its officers, directors, employees, agents, independent contractors and sales persons, jointly and severally, from and against any and all claims, actions, proceedings, liabilities, injuries, judgments, damages, losses, settlements, costs and expenses, including, without limitation, attorney's fees and costs, relating in any manner to or arising out of any of the following: (i) all actions taken or omitted by Broker under this Agreement, except where Broker has been adjudged to have engaged in willful misconduct or has been grossly negligent with respect to the performance of its duties hereunder; (ii) the physical condition of the Property; (iii) the existence of any environmental contaminants, hazardous or toxic substances or products in, on or in proximity to the Property; and (iv) any failure or omission by Owner to provide Broker with complete or accurate information concerning the Property or its condition.

**11. ENFORCEMENT:** The Owner agrees that the Broker may take action to enforce this Listing Agreement or collect any associated costs, fees or damages. Owner agrees to reimburse, indemnify or pay any Broker costs incurred in the enforcement of this Listing Agreement or collection costs, fees and damages, including incidental expenses and reasonable attorney's fees.

**12. NOTICES:** All written notices of any kind which either party may be required to serve on the other in connection with this Listing Agreement shall be delivered in person, sent via certified mail, return receipt requested, or by FEDEX (or any comparable overnight delivery service with signature required upon delivery) to the following addresses:

       If to Broker:     At the address set forth on page 1 of this Agreement

VAR Form 710 (Rev. 1/13)         3

**If to Owner:** _____
_____
_____

Service of any such notice so made by mail shall be deemed to be complete on the earlier of the following to occur: (i) on the delivery date; or (ii) on the third day after mailing or deposit with an overnight delivery service. Either party hereto may, from time to time by notice in writing, serve on the other as aforesaid, designate a different mailing address or a different person to which all such notices or demands are thereafter to be addressed.

~~13. SALE OF PROPERTY. Upon the sale of the Property, Owner agrees to convey the Property to any purchaser or purchasers by general warranty deed with the usual English covenants of title and free and clear from all encumbrances, tenancies, and liens (for taxes or otherwise), but subject to applicable easements and restrictive covenants of record, and to the specific terms and conditions contained in the purchase agreement.~~

**14. WAIVER OF CONFLICT.** Owner hereby authorizes Broker to represent and serve as exclusive agent for any prospective purchaser of the Property or any part thereof, and Owner hereby waives any conflict of interest claim which might arise as a result thereof.

**15. OTHER TERMS:** IF KIM GUSSMANN IS ACTING AS A DUAL AGENT (REPRESENTS OWNER & TENANT) THE OWNER AGREES TO PAY SALES COMMISSION OF 3% OF THE 5-yr TERM, AND IF KIM GUSSMANN IS THE LISTING AGENT & THERE IS ANOTHER LEASING AGENT, THE SELLER AGREES TO PAY A COMMISSION OF 4% OF THE 5-yr LEASE TERM.

**16. MISCELLANEOUS:**

**A.**     This Listing Agreement is not intended to be an offer to sell or lease to a third party, nor may any third party rely upon it as such an offer. Further, this Listing Agreement does not confer upon Broker the power or authority to either make or accept an offer or counteroffer to sell or lease the Property. The Property may be sold or leased only by a written agreement executed by Owner, or by an attorney-in-fact for Owner under a written power of attorney.

**B.**     If, after a valid agreement for the purchase or leasing of the Property is executed by Owner and a purchaser or tenant, whichever is applicable, there is a default by such purchaser or tenant which prevents performance of such agreement through no fault of the Owner, Broker agrees that Owner will not be liable for the Fee of Broker and that Broker shall look to such defaulting purchaser or tenant for its Fee as compensation relating to such contract. Owner agrees that if such a default occurs, this Listing Agreement shall remain in effect between the Owner and Broker until its expiration and that payment of the Fee of Broker by such defaulting purchaser or tenant shall not satisfy an obligation which may arise if, subsequent to such default, another valid agreement for the purchase or leasing of the Property is brought about by Broker.

**C.**     If, (i) after a valid agreement for the purchase or leasing of the Property is executed by Owner and a purchaser or tenant, whichever is applicable, there is a default by Owner which prevents performance of such agreement through no fault of Broker, or if (ii) Owner fails to fully perform the obligations of Owner set forth herein, Owner shall be liable to Broker for the Fee, as compensation for its services hereunder, and the reasonable attorneys' fees and expenses incurred by Broker, if any, in enforcing the terms and conditions hereof.

**D.**     Owner understands and agrees that, in consideration of the use of the services of Broker and the MLS identified in paragraph 8, neither Broker, its officers, directors, brokers, real estate agents or employees,

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com                Bakers Run

ner the MLS or REALTORS® association, their respective directors, officers and employees, shall be liable for any vandalism, theft or damage of any nature whatsoever to the Property or its contents during the Listing Period and any extension thereof, and Owner waives any and all rights, claims, and causes of action against any of them and holds them harmless for any property damage or personal injury arising from the use of or access to the Property by any person during the Listing Period and any extension thereof, but excluding property damage or personal injury arising out of their own willful negligence.

E. This Listing Agreement shall be construed and interpreted according to the laws of the Commonwealth of Virginia and may not be modified except by written instrument executed by the parties. This Listing Agreement shall not be assigned, except with the prior written consent of the other party, and shall inure to the benefit of the heirs, personal representatives, successors, and permitted assigns of the parties.

F. Use of Listing Content; Intellectual Property Assignment. Seller acknowledges and agrees that all photographs, images, graphics, video recordings, virtual tours, drawings, written descriptions, remarks, narratives, pricing information, and other copyrightable elements relating to the Property provided by Seller to Broker or Broker's agent, or otherwise obtained or produced by Broker or Broker's agent in connection with this Agreement, and any changes to such information (the "Listing Content"), may be filed with one or more multiple listing services, included in compilations of listings, and otherwise distributed, publicly displayed and reproduced. Seller hereby irrevocably assigns and transfers to Broker any and all copyright rights and other intellectual property rights, and all actions and causes of action related to the foregoing, and all damages, profits, and other recoveries related thereto, which Seller may have or acquire in and to any and all Listing Content. Seller represents and warrants to Broker that the Listing Content and this assignment of rights to Broker does not violate or infringe upon the rights, including any copyright rights, of any person or entity. Seller shall indemnify Broker against all damages, costs, and liabilities, including twenty-five percent (25%) attorney fees, arising from any claim that the Listing Content or any portion of the Listing Content infringes the rights of any third party.

Owner:

Name: _____

Date: 12/19/14

Title: _____

Accepted by:

Firm Broker: _____   Date 19 Dec 2014

Listing Agent

G. Copyrighted 2011 by the Central Virginia Regional MLS™, LLC ("CVR MLS"). This form is licensed to the Virginia Association of Realtors® ("VAR") for use by members of VAR and may not be otherwise used or duplicated without the written consent of CVR MLS. Seek legal advice if you do not understand any provision of this form.

VAR Form 710 (Rev. 1/15)   5

## AGREEMENT FOR EMPLOYMENT OF A
## REAL ESTATE PROFESSIONAL FOR LEASING

M.D.M. Property, LLC, a Virginia organization (hereinafter, the client), and the Gunselman Realty and Property Management, LLC and Ms. Kim Gunselman (hereinafter collectively, the Gunselman Realty), agree as follows:

1. The client hereby employs the Gunselman Realty and Property Management, LLC and Ms. Kim Gunselman to represent, advice, and perform real estate related professional services for the client on matters related to bring in tenants and related matters. The address of the subject property is 5700 Salem Run Blvd Spotsylvania VA 22407.

2. The services to be performed by the Gunselman Realty under this contract include the following:

   a. Provide professional service to bring in new tenants

   b. Any other related professional services related to bring in new tenants.

3. The client agrees to compensate the Gunselman Realty for services performed under this contract as follows:

   a. If the Gunselman Realty is acting as a dual agent the Debtor agrees to pay commission of 3% of the total basic rent payment for the 5-year lease term

   b. If the Gunselman Realty is the listing agent and there is another leasing agent the Debtor agrees to pay commission of 4% of the total basic rent payment for the 5-year lease term.

4. The client has never paid before on this matter

5. The Gunselman Realty warrants that the Gunselman Realty and Property Management, LLC and Ms. Kim is knowledgeable in the fields of real estate market and is experienced in bringing in new tenants; that the Gunselman Realty has no connection with the client, the client's creditors, any other party in interest, lawyer Weon G Kim and accountants, the United States trustee, or any person employed in the office of the United States trustee that would preclude the Gunselman Realty from representing the client as a debtor in possession in a Chapter 11 case; and that the Gunselman Realty does not hold or represent an interest that would be adverse to the interest of the estate in a chapter 11 case.

6. The Gunselman Realty agrees to fully account for all compensation that it will be receiving from the Debtor under this contract

8. Either party may terminate this contract at any time, subject to the approval of the bankruptcy court, if necessary.

1

Exhibit A-2

IN WITNESS WHEREOF, the parties have executed this contract on the 17th day of December, 2014

/s/ Weon G. Kim
by, Weon G. Kim
on behalf of Debtor
Weon G. Kim Law Office
8200 Greensboro Dr. #900
McLean VA 22102

/s/ Kim Gunselman
by, Ms. Kim Gunselman
President of Gunselman Realty and Property Management.

2

# LEASE AGREEMENT

THIS AGREEMENT is made effective on ~~February~~ _____, 2015, between MDM Property, LLC, hereinafter referred to as Landlord, and Guang Liang Xing, hereinafter referred to collectively as Tenant.

## WITNESSETH:

In consideration of the agreements hereinafter contained, the parties agree as follows (the capitalized terms used in this Agreement are defined in Section 20 and are intended to have the meanings therein indicated):

## SECTION 1 - PREMISES

1.1    Premises. Subject to the terms of this Agreement, the Landlord hereby demises and lets to the Tenant and the Tenant hereby leases from the Landlord, all of the Landlord's right, title and interest in and to certain real property and appurtenances and improvements thereon (hereinafter referred to as the "Premises") located at the corner of Salem Church Rd. and Salem Run Blvd. and designated as the "Retail Building", consisting of space being computed by measuring from the outside surfaces of outer building walls and the center lines of interior walls, approximately 1,500 square feet, and particularly known as 5700 Salem Run Blvd, Fredericksburg, VA 22407.

1.2    Improvements. The Tenant is prohibited from constructing any modifications or Improvements on the Premises and agrees that all such improvements now or hereafter placed on the Premises shall be done only upon the advance written approval of Landlord, which may be declined for any reason, and any such improvements hereby are deeded in perpetuity and in fee simple to Landlord, and nothing herein shall be deemed to infer that the Tenant has reserved title to the Improvements or severed ownership of the Improvements from the Premises. Notwithstanding any future Improvements being placed upon the Premises by Tenant, the terms of this Agreement will govern the use, operation and transfer of the Improvements and the exercise of the Tenant's rights with respect thereto. On termination of the Lease Term, whether by expiration of time or as otherwise herein provided, title to all Improvements will pass in fee simple absolute from the Tenant to the Landlord without compensation to the Tenant or the requirement of any additional action by the Landlord or the Tenant, provided further that Tenant may, at the option of Landlord, be permitted to remove from the premises any equipment affixed to the Premises or Improvements made to the Premises upon repair and restoration of the Premises to their original condition prior to installation of such equipment or Improvements at Tenant's expense. The Landlord and the Tenant intend the Improvements to constitute real property for all purposes and hereby expressly characterize the Improvements as real property rather than personal property for all purposes.

1.3 Title Exceptions. The Tenant is satisfied with the status of title to the Premises as held by the Landlord subject to the following items:
******Not Applicable******

1

Exhibit B

1.4   Physical Condition. The Tenant accepts the Premises in its present condition and without any representation or warranty of any kind by the Landlord. The parties intend that the Landlord transfer and the Tenant accept the Premises in 'AS IS" condition "WITH ALL FAULTS."

### SECTION 2 - TERMS

*one(1) - five (5) years option
X first*

2.1   Lease Term. The term of this Agreement is five (5) years and will commence at 12:01 a.m. on March 1, 2015 and terminate at 12:00 midnight on February 28, 2020, unless sooner terminated or extended as herein provided. Tenant is granted right of possession as of ~~March 1,~~ 2015.

2.2   Nonterminability. Except as expressly provided in Section 14 of this Agreement, the Tenant will have no right to terminate this Agreement or to quit, abandon or surrender the leasehold estate hereby created or to have all or any part of the Premises or Improvements to be released, relieved or discharged from any obligation or liability hereunder for any reason, including, without limitation, any damage to or destruction of all or any part of the Improvements or Premises, any interference, damage or modification with the use or possession of all or any part of the Premises or Improvements, any acquisition by the Tenant of ownership of any reversionary estate or remainder interest covering all or any part of the Premises, any default or other breach by the Landlord of the terms of the Agreement, the occurrence of any act which renders the performance by the Landlord or the Tenant of this Agreement impossible or frustrates the use of the Premises or Improvements for any purpose, any force majeure or any action or threatened action of any court, administrative agency or other governmental authority.

2.3   Prorations. If the commencement date or the expiration date of the Lease Term is a date other than the first day of a month, the installment of Rent for the month in which such date occurs will be prorated based on a thirty (30) day month. If any charge comprising Additional Rent is computed for a term beginning before the commencement date or extending beyond the expiration date of the Lease Term, the charge will be prorated between the Landlord and the Tenant based on a three hundred sixty (360) day year.

2.4 Option to Renew lease. The parties hereby agree that upon expiration of the term of this Lease, and for a period continuing for sixty days after said expiration date, the Landlord agrees that Tenant shall be given the first right of refusal to renew and extend the lease for a period of five (5) additional years following expiration of the initial lease terms hereof, or such additional term beyond the aforesaid renewal period as may be mutually agreed upon by Landlord and Tenant. Base rent for the renewal period shall be at ~~prevailing market rate at the time or at the landlord's discretion.~~ Tenant shall provide written notice to the landlord of their intention of renewal of the lease at least at least 6 months prior to the termination date. *Same as over the last year of the INITIAL TERM & CONTINUE during the option term with 5%*

If the Tenant does not accept the Landlord's terms, the Landlord will thereafter be *increase* authorized to lease or convey the Landlord's interest in the Premises and/or Improvements to any *every* transferee other than the Tenant without restriction or limitation. The Tenant's right of first refusal *+ two year* shall terminate regardless of whether or not a transfer by lease or otherwise of the interest of the

2

*X first*

Landlord which was the subject of the offer is consummated within such sixty day period, and any subsequent transferee of such interest will not be further bound by the provisions of this Section. Absent any notice to the contrary, this lease shall automatically terminate at the conclusion of the initial lease term hereof.

2.5 Security Deposit. The Tenant shall pay the sum of Two Thousand ~~Six~~ Hundred and Fifty ~~Eight~~ dollars ~~and Thirty Four Cents~~ (~~$2,658.34~~) made payable M.D.M. Property LLC. as a security deposit to be held as security for faithful and timely payment of rent and abidance by all terms of this Lease, to be refunded upon termination of the Lease term, subject to retention for any damages, reasonable wear and tear excepted, and all unpaid rent or other impositions due hereunder.

## SECTION 3 - RENT

3.1 Rent. The Tenant agrees to pay to the Landlord throughout the Lease Term as fixed minimum Base Rent $11.00 per square feet with additional Tenant's proportionate share of Taxes, Insurance, and CAM Fee total of $3.00 per square feet. Base Rent will be paid in monthly installments of One Three Hundred Twenty Nine Dollars and Seventeen Cents ($1,375.00) each, payable in advance, commencing on March 1, 2015, and on the first day of each month thereafter and ending on February 28, 2020. The fixed minimum rental specified above shall be increased annually during the Term hereof and any extension thereof as of the date the first monthly payment of each subsequent Lease Year is due, such increase to commence on the first day of the second (2nd) Lease Year, and each such increase to be an amount equal to three percent (3%) of the fixed minimum rental payable during the preceding Lease Year. The fixed minimum rental shall be payable in advance on the first day of each calendar month during the Term hereof.

3.2 Late Fee. Tenant agrees to pay late fee of 5% of rent or additional rent payment in 3.3 when the landlord does not receive the payment by the 5th day of each month.

3.3 Additional Rent. All amounts and charges in addition to the fixed minimum rental required to be paid by the Tenant in accordance with the terms hereof shall be deemed to be additional rent, and all rent and additional rent shall be paid without offset or deduction. Such amounts or charges if not paid at the time provided in this Lease, shall be collectible as additional rental with the next payment of the fixed minimum rental due and payable hereunder; provide, however, that nothing herein contained shall be deemed to suspend or delay the time for any payment to be made by the Tenant hereunder or to limit any other remedy of the Landlord. Time is of the essence.

## SECTION 4 - USE

4.1 Use. The Tenant is hereby granted the right to occupy and use the Premises for commercial purpose of operating a Chinese restaurant and the maximum number of people allowed to occupy the Premises shall be at all times limited to such restrictions as are imposed by Legal Requirements of the Local Government.

4.2 Quiet Enjoyment. So long as the Tenant observes and performs all of the terms of

3

this Agreement, the Landlord warrants the peaceful and quiet occupation and enjoyment of the Premises by the Tenant free and clear of interference by any Person claiming under the Landlord. The Tenant hereby grants to the Landlord, its agents and representatives, the right to enter and inspect the Premises and Improvements at reasonable times with or without prior notice. It is understood that the Landlord will have no duty to make any such inspection and will not incur any liability or obligation with respect to any state of facts which are or might have been discovered by reason of any such inspection.

4.3    Easements.  The Landlord will have the right from time to time to enter into agreements with utility companies and the owners of adjacent properties creating such easements as are reasonably required to service and provide access to the Premises and Improvements. The Tenant hereby agrees to consent thereto and to execute such documents and to take such other action as might be reasonably required to effectuate such agreements provided that the Tenant pays all expenses relating thereto.

## SECTION 5 – COMMON AREA

5.1    The term "Common Area" is defined for all purposes of this Lease as that part of the Commercial Property intended for the common use of all tenants, including among other facilities (as such may be applicable to the Commercial Property), parking areas, private streets and alleys, landscaping and landscaped areas, curbs, common loading areas, sidewalks, malls and promenades (enclosed or otherwise), lighting facilities, drinking fountains, meeting rooms, public toilets, and the like, but excluding (i) space in buildings (now or hereafter existing) designated for rental for commercial purposes, as the same may exist from time to time, (ii) easements, streets and alleys maintained by a public authority, (iii) areas within the Commercial Property which may from time to time not be owned by Landlord (unless subject to a cross-access agreement benefiting the area which includes the Demised Premises), (iv) loading areas reserved for the use of a single tenant, and (v) areas leased to a single-purpose user (such as a bank or a fast-food restaurant) where access is restricted.  In addition, although portions of the Commercial Property (for example and not by way of limitation, the roof(s) and exterior walls of the building(s) in the Commercial Property) are not literally part of the Common Area, they will be deemed to be so included for purposes of (i) Landlord's ability to prescribe rules and regulations regarding same and (ii) their inclusion for purposes of Common Area maintenance reimbursements.  Landlord reserves the right to change from time to time the dimensions and location of the Common Area, as well as the dimensions, identity and type of any buildings in the Commercial Property.  For example, and without limiting the generality of the immediately preceding sentence, Landlord may from time to time substitute for any existing parking area any other areas reasonably accessible to the tenants of the Commercial Property, which area may be elevated, surface or underground.

5.2    Except as may be otherwise shown on the Site Plan, Tenant, and its employees and customers, and when duly authorized pursuant to the provisions of this Lease, its subtenants, licensees and concessionaires, shall have the nonexclusive right to use the Common Area (excluding roofs of buildings in the Commercial Property) as constituted from time to time, such use to be in common with Landlord, other tenants in the Commercial Property and other persons permitted by Landlord to use the same, and subject to such reasonable rules and regulations

4

governing use as Landlord may from time to time prescribe. For example, and without limiting the generality of Landlord's ability to establish rules and regulations governing all aspects of the Common Area, Tenant agrees as follows:

(a)     Landlord may from time to time designate specific areas within the Commercial Property or in reasonable proximity thereto in which automobiles owned by Tenant, its employees, subtenants, licensees and concessionaires shall be parked; and in this regard, Tenant shall furnish to Landlord upon request a complete list of license numbers of all automobiles operated by Tenant, its employees, subtenants, licensees and concessionaires, and Tenant agrees that if any automobile or other vehicle owned by Tenant or any of its employees, subtenants, licensees or concessionaires shall at any time be parked in any part of the Commercial Property other than the specified areas designated for employee parking, Tenant shall pay to Landlord as Additional Rental upon demand an amount equal to the daily rate or charge for such parking as established by Landlord from time to time for each day, or part thereof, such automobile or other vehicle is so parked.

(b)     Tenant shall not solicit business within the Common Area or take any action which would interfere with the rights of other persons to use the Common Area.

(c)     Landlord may temporarily close any part of the Common Area for such periods of time as may be necessary to make repairs or alterations or to prevent the public from obtaining prescriptive rights.

(d)     With regard to the roof(s) of the building(s) in the Commercial Property, use of the roof(s) is reserved to Landlord or, with regard to any tenant demonstrating to Landlord's satisfaction a need to same, to such tenant after receiving express prior written consent from Landlord.

5.3     Tenant shall be responsible for the costs of operation, and maintenance of the Common Area, the manner of maintenance and the expenditures therefore to be in the sole discretion of Landlord, but to be generally in keeping with similar Commercial Properties within the same geographical area as the Commercial Property.

5.4     In addition to the rentals and other charges prescribed in this Lease, Tenant shall pay to Landlord, as Additional Rental, Tenant's proportionate share of the cost of operation and maintenance of the Common Area (including, among other costs, if applicable to the Commercial Property, those for lighting, painting, water, sewerage, storm water drainage systems and other utilities, landscaping, wetlands areas, valet parking, gardening, resurfacing, striping, bumpers, exterminating, cleaning, policing, inspection, repairing and replacing), which may be incurred by Landlord in its discretion including a reasonable portion of whatever management fee Landlord pays to the manager of the Commercial Property and a reasonable allowance for Landlord's overhead costs which cost is referred to collectively herein as the "Common Area Maintenance Charge", plus the cost of any insurance for which Landlord is not reimbursed pursuant to Section 6.2. Tenant shall also pay to Landlord Tenant's proportionate share of the cost of

maintenance, repair, operation and/or replacement of the on-site and off-site storm water drainage, retention and/or detention facilities and related site facilities which serve the Commercial Property. In addition, although portions of the Commercial Property (for example and not by way of limitation, the roof(s) and exterior walls of the building(s) in the Commercial Property) are not literally part of the Common Area, Landlord and Tenant agree that the maintenance, repair and replacement of the same shall be included as a Common Area maintenance item to the extent not specifically allocated to Tenant under this Lease nor to another tenant pursuant to its lease. The proportionate share to be paid by Tenant of the cost of operation and maintenance of the Common Area shall be computed on the ratio that the total Rentable Area of the Demised Premises bears to the total Rentable Area of all buildings within the Commercial Property (excluding, however, areas owned or maintained by a party or parties other than Landlord); provided that in no event shall such share ever be less than the amount specified in Section 1.3 above. If this Lease should commence on a date other than the first day of a calendar year or terminate on a date other than the last day of a calendar year, Tenant's reimbursement obligations under this Section 7.4 shall be prorated based upon Landlord's expenses for the entire calendar year. Each month during the term of this Lease, Tenant shall pay to Landlord one-twelfth (1/12) of the estimated Common Area Maintenance Charge for the current year which Landlord may have heretofore given Tenant for the current year or, if the Common Area Maintenance Charge for the current year have not been estimated by Landlord, then Tenant shall pay one-twelfth (1/12) of the actual Common Area Maintenance Charge for the immediately preceding calendar year. <u>Each such Common Area Maintenance Charge payment shall be due and payable at the same time and the same manner as the time and manner of the payment of Minimum Guaranteed Rentals provided in this Lease. The amount of the initial monthly Common Area Maintenance Charge will be that amount set out in Article III, Section 3.1 above.</u> The initial Common Area Maintenance Charge is based upon Tenant's proportionate share of the estimated Common Area Maintenance Charge related to the Commercial Property for the year in question, and the monthly Common Area Maintenance Charge is subject to increase at any time during the term of this Lease as determined by Landlord to reflect an accurate payment of Tenant's estimated proportionate share of the Common Area Maintenance Charge. If Tenant's total Common Area Maintenance Charge payments are less than Tenant's actual proportionate share of the Common Area Maintenance Charge related to the Commercial Property, Tenant shall pay to Landlord, upon demand, the difference; if the total Common Area Maintenance Charge payments of Tenant are more than Tenant's actual proportionate share of the Common Area Maintenance Charge related to the Commercial Property, Landlord shall retain such excess and at Landlord's option such excess sum shall either (i) be credited against the next maturing installments due from Tenant to Landlord for Tenant's proportionate share of actual Common Area Maintenance Charge or (unless otherwise provided herein), (ii) be refunded by Landlord to Tenant upon termination of this Lease.

## <u>SECTION 6 - REPAIRS, ALTERATIONS, ADDITIONS</u>

6.1    <u>Maintenance and Repair</u>. Throughout the Lease Term the Tenant will maintain the Premises and Improvements in good and clean order and condition, ordinary wear and tear excepted, and will promptly make all necessary or appropriate repairs, renewals and replacements, whether interior or exterior, structural or nonstructural, ordinary or extraordinary, foreseen or unforeseen, at its own expense. All repairs, replacements and renewals will be reasonably equal in

\* *Landlord is responsible for replace the broken diing glass window in front of the store, and inspect HVAC to be check & working order by Licence HVAC company w/ receipts at possession date.*

quality to the original Improvements. The Tenant, at its own cost, will maintain the heating and cooling systems and will not do any act to cause waste or harm to the Premises. All such action will be performed at the expense of the Tenant and the Landlord will not be required to maintain, alter, repair, rebuild or replace all or any part of the Premises or the Improvements in any way. The Tenant expressly waives any right to make repairs at the expense of the Landlord which might be provided for any law now or hereafter in effect.

6.3    _Maintenance of Roof and Exterior Walls._ Landlord shall keep the foundation, the exterior walls (except plate glass; windows, doors, door closure devices and other exterior openings; window and door frames, molding, locks and hardware, special store fronts; signs, placards, decorations or other advertising media of any type; and interior painting or other treatment of interior walls) and roof of the Demised Premises in good repair. Landlord, however, shall not be required to make any repairs occasioned by the act or negligence of Tenant, its agents, employees, subtenants, assignees, licensees and concessionaires (including, but not limited to, roof leaks resulting from Tenant's installation of air conditioning equipment or any other roof penetration or placement,); In the event that the Demised Premises should become in need of repairs required to be made by Landlord under this Lease, Tenant shall give immediate written notice thereof to Landlord; and Landlord shall not be responsible in any way for failure to make any such repairs until a reasonable time shall have elapsed after receipt by Landlord of such written notice (and provided that if Landlord has commenced any such repair within a reasonable time after Landlord's receipt of any such notice and is diligently pursuing such repair then the time for completion for such repair shall be reasonably extended).

6.2    _Utility Charges._ Throughout the Lease Term the Tenant will pay all Utility Charges before the same become delinquent and the Landlord will have no obligation with respect thereto.

## SECTION 7 - LEGAL REQUIREMENTS

7.1    _Compliance._ The Tenant agrees to comply with all Legal Requirements throughout the Lease Term at the Tenant's expense. The Landlord will have no responsibility of any kind with respect to any Legal Requirement.

7.2    _Permitted Contest._ The Tenant will have the right to contest the validity or application of any Legal Requirement by diligent pursuit of appropriate legal proceedings conducted at the tenant's expense. Any such contest may be brought in the name of the Landlord if required by law, and the Landlord agrees to execute and deliver such instruments as are reasonably requested by the tenant to facilitate such contest. If allowed by law, the Tenant may delay compliance with the contested Legal Requirement until final determination of the contest; provided, that if the failure of the Tenant to comply with the disputed Legal Requirement will subject the Premises, the Improvements or any part thereof to forfeiture or the Landlord to liability arising from such noncompliance, the Tenant will promptly comply with the Legal Requirement or deposit with the Landlord such collateral or other assurance as might be reasonably required by the Landlord to protect the Premises, the Improvements and the Landlord from liability or forfeiture by reason of such noncompliance.

7

7.3    Evidence of Compliance.  The Tenant agrees to furnish to the Landlord within ten (10) days after the Landlord's written request therefore such permits, orders, certificates or other documents as might be reasonably requested by the Landlord to evidence compliance with Legal Requirements applicable to the land, the Improvements, or the Landlord.

## SECTION 8 - LIENS; LEASEHOLD MORTGAGE

8.1    Liens.  The Tenant will not directly or indirectly create or permit to be created or to retain any lien, encumbrance or claim affecting the Premises or the Landlord's interest under this Agreement.  In the event of the filing of any such lien, encumbrance, or claim against the Landlord, the Premises, or the Landlord's interest hereunder, the Tenant will cause the same to be discharged of record at the Tenant's expense within ninety (90) days after written notice from the Landlord. The Tenant will have the right to contest any such claim by diligent pursuit of appropriate legal proceedings which may be conducted by the Tenant at the Tenant's expense in the name of the Landlord, if legally required.  If at any time during the contest of such claim the Premises, or the Landlord's interest hereunder becomes subject to forfeiture, or :f the Landlord becomes subject to liability arising from nonpayment of the same, the Tenant will promptly pay the disputed claim or will deposit with the Landlord such collateral or other assurances as might be reasonably required by the Landlord to protect the Premises, the Landlord's interest hereunder, and the Landlord from any liability or forfeiture by reason of such claim.

8.2    Leasehold Mortgages.  The parties acknowledge that the Tenant shall at no time be entitled or authorized to place any mortgage or encumbrance on the Improvements, Premises or any Interest of the Landlord or Tenant hereunder, except at Landlord's sole discretion, and shall not be authorized to do so in any event without advance written consent from Landlord (which consent may be withheld for any reason whatsoever, in the sole discretion of Landlord).  The Tenant agrees that the Tenant will promptly perform and observe or cause to be performed and observed all of the terms, covenants and conditions required to be performed and observed by the Tenant as mortgagor under any Mortgage and will do or cause to be done all things necessary to preserve and keep unimpaired the Tenant's rights as mortgagor under the First Mortgage.  The Tenant will promptly [and in any event within ten (10) days after the occurrence thereof] notify the Landlord of the receipt of any notice from any Mortgagee claiming that the Tenant is in default pursuant to any covenants or conditions of the Mortgage and will cause a copy of each such notice from the Mortgagee to be promptly delivered to the Landlord.  On receipt by the Landlord from the Tenant or the Mortgagee of any written notice claiming a default by the Tenant under any Mortgage, the Landlord is authorized to rely thereon and the Tenant authorizes the Landlord, at the Landlord's option, to pay such sums and to take such action as the Landlord deems necessary or desirable to cure such default under any Mortgage, even though the existence of such default or the nature thereof is questioned or denied by the Tenant or by the Tenant or by any party on behalf of the Tenant.  The Tenant hereby expressly grants to the Landlord the immediate and absolute right to enter upon the Premises and the Improvements or any part thereof to such extent and as often as the Landlord, in the Landlord's sole discretion, deems necessary or desirable in an effort to prevent or cure any such default under any Mortgage.  To the extent that the Landlord elects to cure any default under any Mortgage, the Landlord will be subrogated to all liens held by the Mortgagee to

**8**

the extent of any payment or performance rendered by the Landlord under the First Mortgage. All costs incurred by the Landlord in curing any actual or claimed default under any Mortgage will be reimbursed by the Tenant to the Landlord and will constitute Additional Rent payable hereunder. Notwithstanding any action taken by the Landlord to cure any default by the Tenant under any Mortgage, at the option of the Landlord, such default under the Mortgage will be deemed to be a Default hereunder which will entitle the Landlord to exercise any and all of the rights provided herein.

## SECTION 9 - SUBLETTING

9.1     Tenant's Right to Sublet. The Tenant will not at any time have the right to sublet all or any portion of the Premises and/or the Improvements from time to time during the Lease Term without obtaining the consent of the Landlord, which consent may be withheld for any reason whatsoever, in the sole discretion of Landlord.

9.2     Attornment of Subtenants. The Tenant agrees that each sublease entered into by the Tenant during the Lease Term will contain a provision whereby the subtenant agrees to attorn to the Landlord in the event of the termination of this Agreement. Within thirty (30) days after written demand, but not more often than one each year, the Tenant will furnish to the Landlord a schedule, certified as correct by the Tenant, setting forth all subleases then in effect including the names of the subtenants thereunder, a description of the demised premises and the amount of annual rent payable by each subtenant.

9.3     Nondisturbance Agreements. The Landlord agrees that the Landlord will execute and deliver from time to time within ten (10) days after each written request by the Tenant, agreements among the Tenant, the Landlord and any subtenant to the effect that a termination of the this Agreement and the leasehold estate hereby created will not terminate the sublease between the Tenant and the subtenant provided that: (a) the terms of the sublease between the Tenant and the subtenant represent a good faith effort by the Tenant to lease the demised premises at rental rates and on terms prevailing in the Chesapeake market at the time of execution of such sublease; (b) all expenses of preparing any such nondisturbance agreement will be paid by the Tenant or the subtenant; and (c) the Landlord will incur no obligations to the subtenant under the terms of the nondisturbance agreement other that the terms hereafter set forth in this Section 9.3. To the extent that the Landlord has entered into such nondisturbance agreements with any subtenant, the sublease which the subtenant holds on the termination of this Agreement will be deemed to constitute a direct lease between the Landlord and the subtenant and will have the same force and effect as if the Landlord will not name any subtenant holding a nondisturbance agreement executed by the Landlord in any action to terminate this Agreement or to exercise any other relief to which the Landlord might be entitled hereunder.

## SECTION 10 - TENANT'S TRANSFER

10.1     Right to Assign. Tenant will not, at any time, without the written consent of the Landlord (which consent may be withheld for any reason whatsoever, in the sole discretion of Landlord), assign in whole or in part the rights of the Tenant under this Agreement, the leasehold estate hereby created and all or any portion of the Tenant's interest in the Premises and the

**9**

Improvements; provided, however, that should the Landlord grant the right of assignment, then each such assignment will be subject to the terms of this Agreement. In the event the Tenant elects to enter into one or more such assignments, the Tenant agrees to deliver to the Landlord true and complete copies of the instruments effecting each such assignment within thirty (30) days after the effective date of such assignment.

      10.2      <u>Assumption</u>. The Landlord will have the right to require that any assignee of all or any part of the interest of the Tenant under this Agreement, the leasehold estate hereby created or all or any portion of the Tenant's interest in the land or the improvements deliver to the Landlord an agreement in writing whereby such assignee assumes the full performance of all the Tenant's obligations under this Agreement for so long as such assignee is the holder of all or any portion of the Tenant's interest hereunder.

      10.3.      <u>Atornment</u>. Any assignee of the Tenant will have the right to pay Rent hereunder and to perform any other obligation of the Tenant under this Agreement and the Landlord agrees to accept such payment and performance from the assignee as if performance had been rendered by the party originally named as Tenant in this Agreement.

## <u>SECTION 11 - LANDLORD'S TRANSFER</u>

      11.1      <u>Right to Transfer</u>. The Landlord will have the right at any time and from time to time during the Lease Term to sell, convey, transfer and assign all or any portion of the Landlord's interest in this Agreement, the Premises or the Improvements; provided, however, the Landlord agrees that such right will not be exercised in violation of any applicable provision of any Leasehold Mortgage. In the event the Landlord elects to enter into one or more such transfers, the Landlord agrees to deliver to the Tenant true and complete copies of the instrument or instruments effecting each such transfer within thirty (30) days after the effective date of such transfer.

      11.2      <u>Right of Refusal</u>. As a condition precedent to the Landlord's right to transfer the Landlord's interest in this Agreement, the Premises, or the Improvements, the Landlord agrees that opportunity to purchase the interest proposed to be transferred by the landlord on the same terms as the Landlord is willing to accept from a prospective transferee. The Tenant will have thirty (30) days after receipt of the Landlord's offer in which to deliver to the Landlord the written acceptance of the offer on the terms stated therein. If the Tenant does not accept the Landlord's offer within such thirty (30) day period, the Landlord will thereafter be authorized to convey the interest which is the subject of the offer to a transferee other than the Tenant on the terms stated in the offer for a period of six (6) months after the end of such thirty (30) day period. If a transfer of the interest of the Landlord which was the subject of the offer is consummated within such six (6) month period, the Tenant's preferential right to purchase such interest will terminate and the transferee of the Landlord's interest and any subsequent transferee of such interest will not be further bound by the provisions of this Section 11.2. If the transfer of the Landlord's interest which is the subject of the offer is not consummated during such six (6) month period, the Landlord's right to transfer the interest which is the subject of the Landlord's offer will terminate and the Tenant's preferential right to purchase the interest of the Landlord which is the subject of the offer will apply to any transfer subsequently proposed by the Landlord.

<u>10</u>

11.3    Attornment.  Provided that the Landlord shall have complied with the terms of Section 11.2, the Tenant agrees to accept and attorn to the transferee of the Landlord's interest hereunder as if such transferee had been the party named as the original Landlord in this Agreement.

## SECTION 12 - INDEMNITY; INSURANCE

12.1    Indemnity.  The Tenant agrees to protect, indemnify and hold harmless the Landlord against all liabilities, obligations, claims, damages, penalties, causes of action, judgments, cost and expenses (including, without limitation, reasonable attorney's fees and expenses) asserted against or incurred by the Landlord, or asserted against the interest of the Landlord in the Premises, the Improvements or this Agreement which do not result from the willful act or gross negligence of the Landlord, its agents, contractors, employees, licensees and invites and which arise by reason of: (a) any injury to or death of any person or any damage to property located in or on the Premises or Improvements; (b) any use, condition or state of repair of all or any part of the Premises or Improvements; (c) any failure by the Tenant to perform the obligations of the Tenant under this Agreement; or (d) any negligence or willful act on the part of the Tenant or any of the Tenant's agents, contractors, employees, licensees or subtenants.  If any action, suit or proceeding is brought against the Landlord by reason of any such occurrence, the Tenant, promptly after the written request of the Landlord, will defend such action, suit or proceeding at the Tenant's expense with legal counsel designated by the Tenant which is reasonably acceptable to the Landlord.

12.2    Insured Risks.  Throughout the Lease Term at the Tenant's expense, the tenant will maintain: (a) insurance against loss or damage to the Improvements by fire, lightning, windstorm, hail, explosion, riot, aircraft, vehicles, smoke and other risks commonly included in extended coverage policies written in Chesapeake, Virginia, in an amount not less than eighty percent (80%) of the full insurable value of the Improvements or in such greater amount as is required to comply with the coinsurance provision of any insurance policy maintained by the Tenant; (b) public liability and property damage insurance applicable to the Premises and Improvements in an amount no less than One Million Dollars (1,000,000.00); (c) appropriate workmen's compensation insurance; and (d) all of the forms of insurance imposed by Legal Requirements or customarily maintained by owners of like properties.

12.3    Policy Provisions.  All insurance maintained by the Tenant pursuant to Section 12.2 will: (a) name the Landlord and the Tenant as named insured for all risks as their respective interest appear; (b) include an effective waiver by the insurer of all rights of subrogation against any named insured; (c) provide that the coverage afforded by such policies will not be canceled by the insurer without prior written notice to the Landlord; and (d) be issued by companies and in forms reasonably satisfactory to the Landlord in all other respects.  Should Landlord, in its sole discretion, deem it necessary to obtain independent insurance or to pay any premium on behalf of Tenant or in lieu of Tenant's failure to do so, then such costs and premiums paid by Landlord shall be assessed against the Tenant as Additional Rent hereunder.

11

12.4      Delivery of Policies.  Promptly after the execution of this Lease and continuously thereafter during the Lease Term, the Tenant will deliver to the Landlord true and correct copies of all insurance policies required by this Lease together with appropriate evidence of payment of the premiums therefor.

## SECTION 13 - DAMAGE AND DESTRUCTION

13.1      Notice.  In case of damage to the Improvements in excess of Ten Thousand Dollars ($10,000.00), the Tenant will promptly give written notice thereof to the Landlord describing the nature and extent of the casualty.

13.2  Restoration.  If the Improvements are damaged or destroyed during the Lease Term, the Tenant will as soon as practicable after the casualty restore the Improvements as nearly as possible to the condition which existed immediately prior to such damage or destruction.  The Tenant will not be entitled to any offset or abatement in Rent or to any termination or extension of the Lease Term as a result of deprivation or limitation of use of the Improvements occasioned by any casualty, or by repairs or replacements required by this Section 13.2.

## SECTION 14 - EMINENT DOMAIN

14.1      If more than thirty percent (30%) of the Rentable Area of the Demised Premises should be taken for any public or quasi-public use under any governmental law, ordinance or regulation or by right of eminent domain or by private purchase in lieu thereof, this Lease shall terminate and all Rent shall be abated during the unexpired portion of this Lease, effective on the date physical possession is taken by the condemning authority.

14.2      If less than thirty percent (30%) of the Rentable Area of the Demised Premises should be taken as aforesaid, and Landlord's lender consents to the restoration of the Demised Premises, this Lease shall not terminate; however, the Minimum Guaranteed Rental (but not Percentage Rental) payable under this Lease during the unexpired portion of this Lease (and, if applicable, any breakpoint of gross sales used to determine Percentage Rental) shall be reduced in proportion to the area taken, effective on the date physical possession is taken by the condemning authority.  Following such partial taking and Landlord's receipt of any condemnation award, Landlord shall make all necessary repairs or alterations to the remaining premises or, if an exhibit describing Landlord's Work is attached to this Lease, all necessary repairs within the scope of Landlord's Work as described in such exhibit, as the case may be, required to make the remaining portions of the Demised Premises an architectural whole.

14.3      If any part of the Common Area should be taken as aforesaid, this Lease shall not terminate, nor shall any Rent payable under this Lease be reduced.

12

14.4        All compensation awarded for any taking (or the proceeds of private sale in lieu thereof) of the Demised Premises or Common Area shall be the property of Landlord, and Tenant hereby assigns its interest therein, if any, to Landlord.

## SECTION 15 – AGENCY DISCLOSURE

15.    Kim Guselman Realty is the brokerage company acting on behalf of the Landlord, and the Landlord is solely accountable for the commission of the agency. Tenant is not responsible for any commission with regard to the the brokerage company

## SECTION 16 – CONFIDENTIALITY

16.    Landlord, Tenant and their Guarantors hereby acknowledge and recognize that all information including but not limited payment terms and amounts whatever contained in this contract shall be confidential and shall not be disclosed to other person or whoever other entities.

16-1    Shall any party discloses the above information or fails to keep the information confidential the breaching party shall reimburse or indemnify the other non-breaching party all the damages and costs and expenses including but not limited to the reasonable attorney fees incurred by the breach.

## SECTION 17 - DEFAULT; REMEDIES

17.1    _Events of Default_. The following events will be deemed to be Events of Default by the Tenant under this Agreement; (a) failure to pay any Rent, Additional Rent or other sums payable by the Tenant hereunder when such sums become due; (b) failure to comply with any term of this Agreement to be observed by the Tenant; (c) abandonment of any portion of the Premises or the Improvements; (d) the filing by or against the Tenant of any proceeding under the Federal Bankruptcy Act or any similar law; (e) the adjudication of the Tenant as bankrupt or insolvent in proceedings filed under the Federal Bankruptcy Act or any similar law; (f) the making by the Tenant of an assignment for the benefit of creditors; or (g) the appointment of a receiver of trustee for the Tenant of any of the assets of the Tenant.

17.2    _Notice; Opportunity to Cure_.  On the occurrence of any Event of Default, the Landlord will have the option to declare the same to be a Default hereunder by written notice to the Tenant specifying the nature of such Default. In the event the Tenant, to the reasonable satisfaction of the Landlord, cures a Default arising from the events specified at Section 17.1(a) within ten (10) days after receipt of such notice, or cures a default arising from the events specified at Sections 17.1(b) or (c) within thirty (30) days after receipt of such notice, or cures a Default arising from the events specified at Sections 17.1(d) through (g) within ninety (90) days after receipt of such notice, the Landlord and the Tenant will be restored to their respective rights and obligations under this Agreement as if no Event of Default had occurred.

17.3    _Remedies_. On the failure of the Tenant to cure a Default within the time provided,

13

the Landlord will have the option to do anyone or more the following without any further notice or demand, in addition to and not in limitation of any other remedy permitted by law or by this Agreement:

17.3.1 <u>Termination</u>. The Landlord may terminate this Agreement, in which event the Tenant will immediately surrender the Premises and the Improvements to the Landlord but if the Tenant fails to do so, the Landlord may, to the maximum extent permitted by law, without notice and without prejudice to any other remedy the Landlord might have, enter and take possession of the Premises and the Improvements and remove the Tenant and the Tenant's property therefrom.

17.3.2 <u>Reletting</u>. The Landlord may enter and take possession of the Premises and the Improvements as the agent of the Tenant without terminating this Agreement and the Landlord may relet the Premises the Improvements as the agent of the Tenant and receive the rent therefor, in which event the Tenant will pay to the Landlord, on demand, any deficiency that might arise by reason of such reletting; the Premises or the Improvements and the failure of the Landlord to relet the same will not release or affect the Tenant's liability for Rent or for damages.

17.3.3 <u>Option to Perform</u>. The Landlord may perform or cause to be performed the obligations of the Tenant under this Agreement and may enter the Premises and the Improvements to accomplish such purpose. The Tenant agrees to reimburse the Landlord on demand for any expense which the Landlord might incur in effecting compliance with the terms of this agreement on behalf of the Tenant.

17.4 <u>No Waiver</u>. No action by the Landlord during the Lease Term will be deemed an acceptance by the Landlord of an attempted surrender of the Premises or the Improvements. No re-entry or taking possession of the Premises or the Improvements by the Landlord will be construed as an election by the Landlord to terminate this Agreement, unless a written notice of termination is signed by the Landlord. Notwithstanding any such reletting, re-entry, or taking possession, the Landlord may at any time thereafter elect to terminate this Agreement for a previous default. The acceptance by the Landlord or payment by the Tenant of rent following the occurrence of an Event of Default will not be construed as the waiver of such Event of Default. No waiver of any Event of Default by the Landlord will be deemed to constitute a waiver of any other or future Event of Default hereunder. Forbearance by the Landlord to enforce one or more of the remedies herein provided will not be deemed to constitute a waiver of any Default. No provision of this Agreement will be deemed to have been waived by the Landlord unless such waiver is in writing signed by the Landlord. The rights and remedies granted to the Landlord in this Agreement are cumulative of every other right or remedy which the Landlord might otherwise have at law or in equity and the exercise of one or more right or remedies will not prejudice the concurrent or subsequent exercise of other rights or remedies. If the Landlord brings any action for enforcement of any right under this Agreement or if the Landlord places any amount payable by the Tenant hereunder with attorney for collection, the Tenant agrees to pay the reasonable attorney's fees and other expenses incurred by the Landlord in connection therewith.

17.5 <u>Surrender</u>. On the expiration or sooner termination of the Lease Term, the Tenant will immediately quit and surrender the Premises and the Improvements to the Landlord in good

<u>14</u>

order and condition, ordinary wear and tear excepted. The Tenant may remove or cause to be removed from the Improvements any personal property, trade fixtures, furniture and equipment which can be removed without material damage to the Premises or the Improvements, unless in Default at the time of termination or expiration. Any such property not so removed by the Tenant within ten (10) days after the termination of the Lease Term will become the property of the Landlord and the Landlord is hereby authorized to dispose of any such property free and clear of any claim by the Tenant thereto.

17.6    Holding Over. If the Tenant continues to occupy the Premises or the Improvements after the expiration or other termination of the Lease Term, holding over will, unless otherwise agreed by the Landlord in writing, constitute a tenancy at will at a daily rental equal to one-thirtieth (1/30th) of that amount which is equal to twice the amount of the Rent payable during the last month prior to the termination of the Lease Term and such holding over will be subject to all of the other provisions of this Agreement.

## SECTION 18 - LIMITATION OF LIABILITY

18.1    Exculpation. Notwithstanding anything to the contrary herein contained, the Tenant agrees to look solely to the Landlord's interest in the Premises and the Improvements for damages, compensation and all claims arising out of the performance of the provisions of this Agreement by Landlord. Nothing in this agreement will impose any personal obligation or liability on the Landlord or any Person comprising the Landlord or any successor, mortgagee, or assignee of the Landlord. On Default, a deficiency or other money judgment may be sought or obtained against the Tenant or any Person comprising the Tenant. Tenant and all subTenants, Assignees, and Successors shall be jointly and severally liable for all full performance of all terms and conditions and Rent hereunder for the entire term of this Agreement.

18.2    Landlord's Remedies. Nothing herein contained will impair any remedy or otherwise limit or restrict the right of the Landlord with respect to the Premises, the Improvements or this Agreement arising from any Default by the Tenant hereunder.

## SECTION 19 - MISCELLANEOUS

19.1    Force Majeure. If either the Landlord or the Tenant is delayed or prevented from performing any term of this Agreement by reason of strikes, walkouts, inability to procure materials, failure of power, restrictive laws or regulations, riots, war or other reason beyond the party's control, then performance will be excused for the period of delay and the time for performance will be extended for a period equal to the period of such delay.

19.2 Notices. Any notice, payment, demand or communication required or permitted to be given by any provision of this Agreement will be deemed to have been given when delivered personally to the party or, when actually received if sent by registered or certified mail, postage and charges prepaid, addressed as follows:

To the Landlord:        M. D. M. Property, LLC

15

73 Chadwick Dr.
Stafford, VA 22556

To the Tenant:        Guang Liang Xing

LENG YANG

19.3    Certificates. Either party will at any time and without charge, within ten (10) days after written request by the other, certify by written instrument as to: whether this Agreement has been supplemented or amended, and if so, in what manner the validity of the Agreement as of the time the request is received; the existence of any Default by either party and any offsets, counterclaims or defense or the part of the other party; the commencement and termination dates of the Lease Term; and such other matters as might be reasonably requested. Such certification may be delivered to any mortgagee or purchaser, or prospective mortgagee or prospective purchaser, or to any other Person specified in the certificate. Information so communicated will be binding on the executing party and may be relied on by the party requesting the same and by the Person to whom the certificate is delivered.

19.4    Governing Law. This Agreement is being executed, delivered and is intended to be performed in Washington, D.C, and the substantive laws of the District of Columbia will govern the validity, construction and enforcement of this Agreement.

19.5    Approvals. When approval by either the Tenant or the Landlord is required hereunder such approval will not be unreasonably withheld. Unless provision is made for a specific period of time, the period of time in which the right of approval will be exercised will be thirty (30) days after receipt of a written notice requesting such approval. If the party whose approval is required neither approves nor disapproves a proposed action within the applicable period, the party will be deed to have given approval of such action. If a party disapproves any action proposed by the other party hereunder, such disapproval will not be effective unless the reasons for such disapproval are stated in writing and provided to the party proposing the action.

19.6    Binding Effect. This instrument constitutes the entire agreement between the parties and may not be changed, modified, amended or supplemented except in writing, signed by both the Landlord and the Tenant. All other oral or written agreements, promises and arrangements in relation to the subject matter of this Agreement are hereby rescinded. This Agreement will be binding on each of the parties and their respective successors and permitted assigns. All Persons to whom any interest in this Agreement, the leasehold estate hereby created, the Premises or the Improvements might be transferred in accordance with the term of this Agreement will, by accepting such transfer, be bound by this Agreement to the same extent as if such transferee had been an original party hereto. This Agreement is intended to create rights between the Landlord and the Tenant and is not intended to confer rights on any other Person or to constitute such Person a third party beneficiary hereunder. If at any time the Landlord or the Tenant is comprised of more than one Person, this Agreement will be jointly and severally binding

16

on each Person comprising the Landlord and the Tenant.

19.7  Execution.  This Agreement may be executed in multiple counterparts with the same effect as if both parties had signed the same document. All counterparts will be construed together and will constitute one agreement. This Agreement will not be binding on or constitute evidence of any agreement until both parties affix their signature to a counterpart of this document.

19.8  Time.  Time is of the essence as to all provisions of this Agreement.

19.9  Merger.  This Agreement and the leasehold estate hereby created will not merge with any other estate or interest in the Premises or the Improvements by reason of the fact that the same Person might own or hold directly or indirectly: (a) the rights of the Tenant under this Agreement or the leasehold estate hereby created or any interest therein; and (b) any other estate or interest in all or any part of the Premises or Improvements. No such merger will occur until such time as all Persons holding an interest in this Agreement and the leasehold estate hereby created and any such other estate or interest in the Premises or Improvements or any part thereof join in a written instrument effecting such merger and duly record the same.

19.10  Limit of Arbitration.  Arbitration may be required only for the determination of the fair market value of the Premises described at Section 3.2 and apportionment of Rent and condemnation awards describing at Section 14 of this Agreement. All other matter will be determined by a court of competent jurisdiction and the party served with notice of arbitration for any matter other than those governed by Sections 3.2 and 14, may reject such notice by failure to respond thereto, by giving notice of rejection or by taking action which is consistent with arbitration.

19.11  Severability.  If any clause or provision of this Lease is illegal, invalid or unenforceable under any present or future law, the remainder of this Agreement will not be affected thereby. It is the intention of the parties that if any such provision is held to be illegal, invalid or unenforceable, there will be added in lieu thereof a provision as similar in terms to such provision as is possible and be legal, valid and enforceable.

## SECTION 20 - DEFINITIONS

20.1  Defined Terms.  The words defined in this Section are intended to have the following meaning when used in this Agreement:

20.1.1  Additional Rent.  The Impositions, insurance premiums, costs of document preparation, Appraisers' fees, attorney's fees, maintenance expenses and other charges and expenses to be paid by the Tenant under the terms of this Agreement.

20.1.2  Agreement.  This Ground Lease Agreement and all modifications and amendments thereto bearing the written approval of both the Landlord and the Tenant.

20.1.3  Appraiser(s).  An independent real estate appraiser who is a member

17

of the American Institute of Real Estate Appraisers doing business in Virginia who has no less than five (5) years of active experience.

   20.1.4  Approved Title Exception(s). The liens, restrictions and other items which affect title to the Premises which are more particularly described at Section 1.3 of this Agreement.

   20.1.5  Default. The occurrence of an Event of Default, the election by the Landlord to exercise the Landlord's remedies by reason thereof and the failure of the Tenant to cure or cause to be cured such occurrences within the time specified in Section 17 of this Agreement.

   20.1.6  Event(s) of Default. The actions or inactions of the Tenant specified at Section 17.1 of this Agreement.

   20.1.7  Fee Mortgage. A mortgage, security agreement, collateral assignment or other instrument creating a lien, security interest or other encumbrance covering all or any part of the Landlord's interest in this Agreement, the Premises or the Improvements and all increases, renewals, modifications, consolidations, replacements and extensions thereof.

   20.1.8  Leasehold Mortgage. The Mortgage and Security Agreement, Assignment of Lessee's Interest in Leases and other security documents as more particularly described or allowed by the Landlord to be placed on the Premises and/or improvements by or at the request of the Tenant, as described in Section 8, and all extensions, renewals, modifications and amendments thereof.

   20.1.9  Leasehold Mortgagee. Such lending institution as Landlord may approve incident to its right of approval of any Leasehold Mortgage pursuant to Section 8, and its successors and assigns in the capacity as the holder of the Leasehold Mortgage.

   20.1.10  Imposition(s). All taxes (including, without limitation, sales and use taxes, rollback taxes, increases in taxes by reason of all improvements, uses, and subdivisions or rezoning of the Premises), assessments (including, without limitation, all assessments for public improvements or benefits, whether or not commenced or completed prior to the date hereof and whether or not to be completed during the Lease Term), water. sewer and other rents, rates and charges, excises, levies, license fees, permit fees, inspection fees and other authorization fees and other charges, whether general or special, ordinary or extraordinary, foreseen or unforeseen, of every character (including all interest and penalties thereon), which at any time during the Lease Term may be assessed, levied, confirmed or imposed on the Premises, the Improvements or any interest therein or against the Tenant or the Landlord in connection therewith. The term "Impositions"' specifically excludes all income, estate, succession, inheritance, transfer, or franchise taxes imposed against the Landlord, the Rent paid to the Landlord or with respect to the Landlord's interest in the Premises other than real estate taxes and rollback taxes; provided, that if during the Lease Term, taxes in the nature of real or personal property ad valorem taxes are levied on the Rent paid hereunder in lieu of all or any portion of the Impositions which the Tenant would otherwise be obligated to pay, such taxes will be included in the meaning of the term "Impositions."

**18**

20.1.11        Improvements. The building and other facilities now or hereafter located or constructed on the Premises and all other structures, fixtures, equipment and other items of tangible property now or hereafter owned by the Tenant and located on the Premises. The term "Improvements" specifically excludes trade fixtures, furniture and furnishing owned by the Tenant and subtenants occupying the Improvements.

20.1.12        Premises. The real property more particularly described at Section 1.1 of this Agreement and the appurtenances and Improvements relating thereto or located thereon.

20.1.13        Landlord. M.D.M. Property LLC. and his successors and permitted assigns.

20.1.14        Leasehold Mortgage. A mortgage, security agreement, collateral assignment or other instrument creating a lien, security interest or other encumbrance covering all or any part of the Tenant's interest in this Agreement, the leasehold estate hereby created, the Premises or the Improvements and all increases, renewals, modifications, consolidations, replacements and extensions thereof.

20.1.15        Leasehold Mortgagee. The Person designated as the holder of any Leasehold Mortgage an such Person's successors and assigns of record.

20.1.16        Lease Term. The one (1) year period identified at Section 2.1 of this Agreement.

20.1.17        Legal Requirement(s). All laws, statutes, codes, ordinances, orders, judgments, decrees, injunctions, rules, regulations permits, licenses, authorizations, directions and requirements of and agreements with all federal, state and local governments, agencies and officials, foreseen and unforeseen, ordinary or extraordinary, which now or at any time hereafter may be applicable to all or any part of the Premises or the Improvements or to any use or condition of all or any part of the Premises or the Improvements or to the Landlord or the Tenant.

20.1.18        Tenant. _____, and his successors and permitted assigns.

20.1.19        Utilities Charge(s). All charges for water, sewer, gas, heat, light, power, telephone service, electricity, refuse collection, tap fees, and other utility and communication services rendered or used on or about all of any part of the Premises or the Improvements and all other similar cost and expenses relating to the use, operation and maintenance of the Premises or the Improvements.

20.2        Construction. Except for the term defined in this Section 20 the descriptive headings contained elsewhere in this Agreement are for convenience only and are not intended to define the subject matter of the provisions of this Agreement.

IN WITNESS WHEREOF, the parties have executed this instrument this _____ day of

19

MARCH
~~February,~~ 2015, effective the date first above written.

_Witness_ ——————— 3/10/2015   _Guang Liang Xing_ .3/10/2015

_Leng Yang_ .   3/10/2015
LENG YANG

_____
Landlord
MDM Properties LLC

**20**